**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEW LIFE EVANGELISTIC CENTER,
INC.,

       Plaintiff,

v.

KATHLEEN SEBELIUS, Secretary of the
U.S. Department of Health and Human
Services,

and

PAUL F. PROUTY, Administrator, U.S.
General Services Administration,

       Defendants.

Civil Action No. 09-1294 (CKK)

**MEMORANDUM OPINION**
(December 8, 2009)

     Plaintiff, New Life Evangelistic Center, Inc. ("New Life" or the "organization"), filed the

above-captioned matter on July 13, 2009, naming as Defendants, Kathleen Sebelius, in her

official capacity as Secretary of the U.S. Department of Health and Human Services ("HHS"),

and Paul F. Prouty, in his official capacity as Administrator of the U.S. General Services

Administration ("GSA") (collectively, "Defendants").  New Life challenges HHS' denial of the

organization's application made pursuant to Title V of the McKinney-Vento Homeless

Assistance Act ("McKinney Act" or the "Act") to use a particular piece of federal property

located at 339 Broadway Street, Cape Girardeau, Missouri for a homeless assistance program.

     On Tuesday, July 21, 2009, shortly after filing the Complaint in this matter, New Life

filed a [9] Motion for Preliminary Injunction.  In order to permit the parties a more generous

(although expedited) schedule for briefing the merits of Plaintiff's Complaint, as well as to

provide the Court with additional time to adequately consider the parties' arguments as set forth therein, the parties agreed that: (1) GSA would not sell the surplus property at issue prior to January 1, 2010 (and would provide the Court and New Life with 30 days notice of any such sale, if GSA decided to sell the property at any time after January 1, 2010); and (2) New Life's [9] Motion for Preliminary Injunction would be converted into and treated as its opening brief on the merits of Plaintiff's Complaint.  Pursuant to that agreement, the Court deems New Life's now-pending [9] motion as its opening motion on the merits.

As set forth therein, New Life contends that HHS' decision denying its application for use of surplus federal property under the McKinney Act is arbitrary, capricious and contrary to the law.  New Life therefore seeks an order vacating HHS' decision below and remanding this case back to HHS for further review and explanation.  Upon thorough consideration of the parties' submissions, the administrative record, applicable case law, the relevant statutory and regulatory authority, as well as the record of this case as a whole, the Court concludes that HHS' decision below must be vacated and this case must be remanded to the agency for further action consistent with this Memorandum Opinion, for the reasons set forth below.

## I.  BACKGROUND

A.      *Statutory and Regulatory Background*

Congress passed the McKinney Act in 1987, recognizing that "the federal government 'has a clear responsibility and existing capacity' to help meet an immediate and unprecedented crisis due to the lack of shelter for a growing number of individuals and families."  *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25, 27 (D.D.C. 2000) (quoting 42 U.S.C. § 1130(a)(1) & (6)).  In particular, Title V of the Act, 42 U.S.C. § 11411, and

its implementing regulations, 45 C.F.R. § 12a *et seq.*, provide a detailed regulatory framework for making "unutilized, underutilized, excess or surplus" federal real property available for use by representatives of the homeless.  45 C.F.R. § 12a.2(a); *see also* 42 U.S.C. § 14111(a)-(f).  The Act appropriates and modifies, in part, the administrative procedures established by the Federal Property and Administrative Services Act of 1949 ("FPASA"), 40 U.S.C. § 541, *et seq.*, which authorizes HHS to dispose of surplus property "as needed for use in the protection of public health," 40 U.S.C. § 550(d)(1), a congressional mandate interpreted to include use by organizations which provide "services (including shelter) to homeless individuals," 45 C.F.R. § 12.3(e).  In order "to use public resources and programs in a more coordinated manner to meet the critically urgent needs of the homeless," 42 U.S.C. § 11301(b)(2), the Act instructs HHS, GSA, and the Secretary of Housing and Urban Development ("HUD"), to cooperate in identifying, publicizing, and reserving suitable surplus federal real property, *id.* § 11411(a)-(d).  Of particular relevance to the case at hand, the Act charges HHS with soliciting and evaluating applications for use of designated properties submitted by representatives of the homeless.  *Id.* § 11411(e).

The process starts with HUD, which is responsible for canvassing the landholding agencies — *i.e.*, the federal department or agency with statutory authority to control the property, 45 C.F.R. § 12a.1.  On a quarterly basis, HUD collects data on properties that are described as unutilized, underutilized, excess or surplus by the landholding agencies (or that are in GSA's current inventory of excess or surplus property).[1]  *Id.* §§ 12a.3(a) & (c).  Within 30 days of

---

[1] Landholding agencies are required to submit to GSA a report of all properties they determine are "excess," 45 C.F.R. § 12a.5(a), which is defined by regulation as "any property under the control of any Federal executive agency that is not required for the agency's needs or

receipt of this information, HUD is required to make a determination as to the suitability of each property for use as a facility to assist the homeless and to notify the landholding agency of its conclusion.  *Id.* §§ 12a.3(a)(1) & 12a.4; *see also id.* § 12a.5(c); 42 U.S.C. § 11411(a).  Pursuant to the implementing regulations, all properties are determined suitable unless a property is affected by one or more of certain enumerated conditions.[2]  *See* 42 C.F.R. § 12a.6.

Once a landholding agency is notified by HUD that a property has been determined to be suitable for use to assist the homeless, the agency must advise HUD within 45 days as follows: (1) with respect to unutilized or underutilized property, the agency must indicate whether (a) it intends to declare the property excess or to make the property available for use to assist the homeless or (b) the reasons why the property cannot be declared excess or made available for use to assist the homeless; and (2) with respect to excess property previously reported to GSA, the agency must indicate whether (a) there is no compelling federal need for the property, such that it may be determined surplus or (b) an explanation as to why there is a further and compelling Federal need for the property, such that it is not presently available for use to assist the homeless. *Id.* § 12a.7; *see also* 42 U.S.C. § 11411(b).

---

the discharge of its responsibilities, as determined by the head of the agency pursuant to [the FPASA]," *id.* § 12a.1.  GSA in turn determines whether such excess property qualifies as "surplus," — *i.e.*, "excess real property [that is] not required by any Federal landholding agency for its needs or the discharge of its responsibilities, as determined by the Administrator of GSA." *Id.*  If the property has not yet been reviewed by HUD for suitability, as discussed above, GSA is responsible for forwarding the necessary information to HUD.  *Id.* § 12a.5(b).

[2] These include: the presence of national security concerns; the property is located within and/or near flammable or explosive materials, runway and military airfield clear zones, and/or floodways; documented deficiencies in the property; or the property is inaccessible.  42 C.F.R. § 12a.6.

HUD is then required to publish in the Federal Register a description of any available property that has been determined suitable for use as a facility to assist the homeless. *See* 45 C.F.R. § 12a.8(a); *see also* 42 U.S.C. § 1411(c). Once such information is published, GSA is authorized to notify certain entities — namely, state and local government units, any known homeless assistance providers that have expressed interest in the particular property, as well as any other appropriate organization — that suitable, excess property is available for use. 45 C.F.R. § 12.a5(g). Properties published as available for use to assist the homeless may not be used by landholding agencies for any other purpose for a period of 60 days from publication of the notice. *Id.* § 12a.9(a)(1); *see also* 42 U.S.C. § 11411(d). Any representatives of the homeless who are interested in such property must send HHS a written "expression of interest" within that 60-day time period. 45 C.F.R. §§ 12a.9(1)-(3), 12.3. Upon timely receipt of a representative's written expression of interest, the property may not be made available for any other purpose until the application has been resolved. *Id.* § 12a.9(a)(2).[3]

Once HHS has received an expression of interest, it sends the interested entity an application packet, which requires the applicant to provide information including the following:

(1) <u>Description of the applicant organization</u>. The applicant must document that it satisfies the definition of a "representative of the homeless" . . . . The applicant must document its authority to hold real property. Private non-profit organizations applying for deeds must document that they are section 501(c)(3) tax-exempt.

(2) <u>Description of the property desired</u>. The applicant must describe the property desired and indicate that any modifications made to the property will conform to local use restrictions except for local zoning regulations.

---

[3] If at the end of the 60-day holding period, no expression of interest has been received for a particular property, GSA or the landholding agency, as appropriate, may proceed with disposal of the property in accordance with the law. 45 C.F.R. § 12a.12(a).

(3) <u>Description of the proposed program</u>. The applicant must fully describe the proposed program and demonstrate how the program will address the needs of the homeless population to be assisted. The applicant must fully describe what modifications will be made to the property before the program becomes operational.

(4) <u>Ability to finance and operate the proposed program</u>. The applicant must specifically describe all anticipated costs and sources of funding for the proposed program. The applicant must indicate that it can assume care, custody, and maintenance of the property and that it has the necessary funds or the ability to obtain such funds to carry out the approved program of use for the property.

(5) <u>Compliance with non-discrimination requirements</u>. Each applicant and lessee under this part must certify in writing that it will comply with the requirements of [the relevant Federal non-discrimination laws]. The applicant must state that it will not discriminate on the basis of race, color, national origin, religion, sex, age, familial status, or handicap in the use of the property, and will maintain the required records to demonstrate compliance with Federal laws.

(6) <u>Insurance</u>. The applicant must certify that it will insure the property against loss, damage, or destruction . . . .

(7) <u>Historic preservation</u>. Where applicable, the applicant must provide information that will enable HHS to comply with Federal historic preservation requirements.

(8) <u>Environmental information</u>. The applicant must provide sufficient information to allow HHS to analyze the potential impact of the applicant's proposal on the environment, in accordance with the instructions provided with the application packet.

(9) <u>Local government notification</u>. The applicant must indicate that it has informed the applicable unit of general local government responsible for providing sewer, water, police, and fire services, in writing of its proposed program.

(10) <u>Zoning and Local Use Restrictions</u>. The applicant must indicate that it will comply with all local use restrictions, including local building code requirements. Any applicant which applies for a lease or permit for a particular property is not required to comply with local zoning requirements. Any applicant applying for a deed of a particular property, pursuant to § 12a.9(b)(3), must comply with local zoning requirements, as specified in 45 CFR part 12.

*Id.* § 12a.9(b); *see also* Administrative Record (hereinafter "AR") at 686-715 (copy of

Application Instruction Booklet for HHS' Federal Property Assistance Program Homeless)

(hereinafter "Application Instruction Booklet").  Applications must be received by HHS within

90 days after receipt of the expression of interest, 45 C.F.R. § 12a.9(d); 42 U.S.C. § 11411(e)(2),

and are considered on a "first-come, first-serve basis," 45 C.F.R. § 12a.9(e)(2).  "Upon receipt of

an application, HHS will review it for completeness and, if incomplete, may return it or ask the

applicant to furnish any missing or additional required information prior to final evaluation of the

application."  *Id.* § 12a.9(e)(1).  Applicants are expressly advised, however, that, "[d]ue to the

short time frame imposed for evaluating applications, HHS' evaluation will, generally, be limited

to the information contained in the application."  *Id.* § 12a.9(c).[4]

HHS must complete its evaluation of an application within 25 days of receipt and

promptly notify the applicant of its decision.  *Id.* § 12a.9(e)(2); *see also* 42 U.S.C. § 11411(e)(3).

Pursuant to the relevant regulations, all applications must be evaluated on the basis of the

following five, non-exhaustive criteria (which are listed in descending order of priority, except

that the final two factors are of equal importance):

> (i) <u>Services offered</u>. The extent and range of proposed services, such as meals, shelter, job training, and counseling.

> (ii) <u>Need</u>. The demand for the program and the degree to which the available property will be fully utilized.

> (iii) <u>Implementation Time</u>. The amount of time necessary for the proposed program to become operational.

---

[4] The Application Instruction Booklet further advises that incomplete applications "will either result in a disapproval of the application or a request for additional information.  It is to the applicant's benefit to err on the side of providing too much information as opposed to omitting information or not providing enough detail.  It is the applicant's responsibility to ensure their application presents all the information requested in a detailed and compete manner."  AR at 691. In the event an applicant needs further time to submit a complete application, it may request an extension of time.  45 C.F.R. § 12a.9(d); AR at 691.

(iv) <u>Experience</u>. Demonstrated prior success in operating similar programs and recommendations attesting to that fact by Federal, State, and local authorities.

(v) <u>Financial Ability</u>. The adequacy of funding that will likely be available to run the program fully and properly and to operate the facility.

45 C.F.R. § 12a.9(e)(2).  In addition, the regulations provide that when construction or major renovation is not required or proposed by an applicant, "the property must be placed into use within twelve (12) months from the date of transfer."  45 C.F.R. § 12.3(c); AR at 689.  If an applicant contemplates construction or major renovation at the date of transfer, "the property must be placed in use within 36 months from the date of transfer."  45 C.F.R. § 12.3(c); AR at 689.[5]  Finally, HHS may add additional evaluation factors as it deems necessary; the application packet must be revised accordingly to include a description of any such newly-added factors.  *Id.* § 12a.9(e)(3).

If HHS approves an application made pursuant to Title V, it notifies the applicant — now grantee — and undertakes the necessary steps to effect assignment and transfer of the property.  *See id.* § 12a.10(b).[6]  As is relevant in this case, if HHS approves an application for excess or surplus property, it requests GSA assign the property to HHS for subsequent

---

[5] Although New Life initially argued in its opening motion that the regulations at 45 C.F.R. Part 12 do not apply to applications under Title V of the McKinney Act, New Life subsequently withdrew that argument in its reply.  *See* Pl.'s Reply at 13, n. 11 (indicating that New Life has "reconsidered and now withdraws this argument").

[6] In the event HHS disapproves of all submitted applications or no completed application or request for extension was received by HHS within 90 days from the date of the last expression of interest, the regulations provide that GSA or the landholding agency may proceed to dispose of the property in accordance with applicable law.  45 C.F.R. § 12a.12.

conveyance to the grantee.[7]  *See id.*  The regulations specify that "[p]rior to assignment to HHS, GSA may consider other Federal uses and other important national needs; however, in deciding the disposition of surplus real property, GSA will generally give priority of consideration to uses to assist the homeless."  *Id.* § 12a.10(b)(2).  Accordingly, GSA will assign the property to HHS for transfer to the applicant, unless GSA determines that another disposal need is so "meritorious and compelling" that it outweighs the needs of the homeless.  *See id.*; *see also* 42 U.S.C. § 11411(f)(3)(A).  If GSA or HHS decides to assign the property to a competing request over a request made by an applicant to use the facility to assist the homeless, the agency must "transmit to the appropriate committees of the Congress an explanatory statement" for that decision.  45 C.F.R. § 12a.10(b)(3); *see also* 42 U.S.C. § 11411(f)(3)(B).

Assuming GSA decides to assign the property to HHS, HHS will, upon receipt of the assignment, transfer the property by quitclaim deed or lease to the grantee.  *See* 45 C.F.R. § 12a.10(b)(1); *see also* 42 U.S.C. § 11411(3).  Title V grantees are entitled to a 100-percent public benefit discount and receive the surplus federal property at no cost.  *See* 45 C.F.R. § 12.9(a) & Exhibit A (of the regulation) (stating that the 100-percent public benefit allowance is "[a]pplicable when [assistance to the homeless] is the primary use to be made of the property.").  McKinney Act grantees, like other public benefit conveyance recipients, must use the property according to the terms approved in their application for a period of 30 years from the date of the initial deed and may not sell, lease, sublease, or otherwise encumber the property without prior

---

[7] If the property at issue is categorized as unutilized or underutilized (as opposed to excess or surplus), HHS forwards the application to the landholding agency who is then responsible for executing the lease or permit document, as may be appropriate.  45 C.F.R. § 12a.10(a).

written consent.  *See id.* §§ 12a.10, 12.9(c).

>    B.    *Factual and Procedural Background*[8]

New Life is a self-described 501(c)(3) organization that provides services to homeless

men, women and children throughout Missouri, Illinois, Kansas and Arkansas.  Compl., Docket

No. [1] ¶ 1; *see also* AR at 717.  On July 13, 2009, the organization filed the above-captioned

matter seeking judicial review of HHS' decision denying New Life's application for federal

surplus property under Title V of the McKinney Act — more specifically, for use of the federal

building and courthouse located at 339 Broadway Street in Cape Girardeau (the "Broadway

Street Property").  *See generally* Compl. ¶ 1.

On December, 19, 2008, GSA issued a determination of surplus for the Broadway Street

Property, noting that the excess property had been screened and no longer served a federal need.

AR at 680; *see also id.* at 157-160.  HUD published an availability announcement in the Federal

Register that same day.  *See* Federal Property Suitable as Facilities to Assist the Homeless, 73

Fed. Reg. 77821-01, 77822 (Dec. 19, 2008).  As described therein, the 47,867-square-foot

property contained two parcels: (1) a 0.82-acre plot on which the federal building, courthouse

and parking lot were located ("Parcel 1"); and (2) a 0.186-acre garden area known as the May

Greene Garden ("Parcel 2").  AR at 680; *see also id.* at 157-160, 170.

---

[8] Consistent with well-settled precedent, the Court's review of HHS' decision is "confined to the full administrative record before the agency at the time the decision was made." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981).  "The focal point for judicial review should be the administrative record already in existence, not some new record completed initially in the reviewing court."  *Id.*  Accordingly, although both parties' briefing at times references information outside the administrative record, the Court does not consider such information in discussing the relevant factual and procedural background of this case or in evaluating the parties' arguments.

New Life filed its expression of interest requesting an application for use of

the property on January 26, 2009, *id.* at 681, and thereafter filed a formal application on May 1,

2009, *id.* at 716-1006.  In its application, New Life proposed serving "temporary and/or

chronically homeless persons in Cape Girardeau, Missouri and the surrounding twenty-two rural

counties."  *Id.* at 721.  More specifically, New Life proposed providing transitional housing and

related services through its "Core Program" to approximately 125 homeless individuals per year,

20 of whom would also be eligible to receive job training through New Life's Leadership Job

Training Program, as well as emergency shelter and a free store to an additional 1,100 homeless

individuals per year.  *Id.* at 721-22.  These services would be made available to five groups of

homeless persons — single homeless men; single homeless women; homeless women and

children; homeless families; and homeless veterans — with a particular focus on homeless

veterans and families.  *Id.* at 721-22.

By letter to New Life President Rev. Lawrence W. Rice, Jr., on May 28, 2009, HHS

denied New Life's application for failure to meet the threshold requirements for four of the five

criteria set forth at 45 C.F.R. § 12a.9(e)(2): namely, services offered, need, implementation time,

and financial ability.  AR at 1023-26.  On July 13, 2009, New Life filed the instant action

challenging that decision.  *See* Compl.  Shortly thereafter, on July 21, 2009, New Life moved for

a preliminary injunction.  *See* Pl.'s Mot., Docket No. [9].  The Court held an on-the-record

telephone conference with counsel for all parties that same day.  *See* 7/21/09 Min. Entry.

Pursuant to that discussion, the parties were required to file a joint status report advising the

Court as to how the parties suggested proceeding with the case; in particular, the parties were to

advise the Court whether: (a) they wanted to proceed immediately with briefing Plaintiff's

request for a preliminary injunction on an emergency basis; or (b) whether they had been able to

reach an agreement that would permit the Court and the parties to address the merits of Plaintiff's

Complaint on a more generous (although expedited) schedule.  *See* 7/24/09 Order, Docket No.

[11].

      The parties timely filed the required joint status report on July 23, 2009.  *See* Docket No.

[10].  As set forth therein, the parties agreed that GSA would stay the sale of Parcel 1 of the

Broadway Street Property until January 1, 2010.  *Id.* at 1.  Following expiration of that stay, GSA

further agreed that it would provide both the Court and New Life 30 days notice prior to selling

Parcel 1.  *Id.* at 2.  With respect to Parcel 2, the parties advised the Court that the area was

currently administered by the United States National Park Service.  *Id.* at 2.  As such, GSA did

not have any legal control over the disposition or sale of Parcel 2 and therefore could not

similarly guarantee that it would not be sold, transferred or otherwise unencumbered prior to

January 1, 2010.[9]  *Id.*  Based on this understanding and agreement by GSA to stay sale of the

majority of the Broadway Street Property that was under its control — *i.e.*, Parcel 1 — the parties

indicated that they had agreed that Plaintiff's Motion for Preliminary Injunction should be

converted into and treated as New Life's opening brief on the merits of its Complaint, and that

the parties should proceed directly to brief the merits of the instant lawsuit on a more generous,

but nonetheless, expedited schedule.  *See id.*

      Based on the parties' representations in their joint status report, the Court issued an Order

on July 24, 2009, adopting the parties' agreement, as set forth above, in full.  *See* 7/24/09 Order,

---

[9] Defendants have since advised that the City of Cape Girardeau took title to Parcel 2 on September 18, 2009.  Defs.' Opp'n at 8, n.9.

Docket No. [11].  Accordingly, as agreed by the parties, New Life's [9] Motion for Preliminary

Injunction would be converted into and treated as Plaintiff's opening brief on the merits of the

Complaint.  *Id.* at 1-2; *see also* Fed. R. Civ. P. 65(a)(2) ("Before . . . beginning the hearing on a

motion for a preliminary injunction, the court may advance the trial on the merits and consolidate

it with the hearing.").  The Court also adopted the parties' proposed briefing schedule (as later

amended), *see* 7/24/09 Order at 2; 9/30/09 Min. Order, pursuant to which Defendants' opposition

and the administrative record were filed on October 9, 2009, and New Life's reply on November

9, 2009.  *See id.*; *see also* 9/30/09 Min. Order.  By permission of the Court, Defendants also filed

a surreply, *see* Docket No. [20], and New Life filed a response to that surreply, *see* Docket No.

[22].  Briefing is now complete, and the merits of New Life's Complaint are ripe for the Court's

review and resolution.

## II.  LEGAL STANDARD

Both parties agree that HHS' decision to deny New Life's application for the Broadway

Street Property is properly analyzed under the standard of review set forth in the APA, pursuant

to which a court must set aside an agency action that is "arbitrary and capricious, an abuse of

discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706.  "'The party

challenging an agency's action as arbitrary and capricious bears the burden of proof.'"  *City of*

*Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quoting *Lomak*

*Petroleum, Inc. v. Fed. Energy Regulatory Comm'n,* 206 F.3d 1193, 1198 (D.C. Cir. 2000)).  To

survive the "arbitrary and capricious" standard, an agency must "'examine the relevant data and

articulate a satisfactory explanation for its action, including a rational connection between the

facts found and the choice made."  *PPL Wallingford Energy LLC v. Fed. Energy Regulatory*

*Comm'n*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n, v. State*

*Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal punctuation omitted).  By contrast,

> an agency [decision] would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given."

*Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Sec. and Exch. Comm'n v. Chenery Corp.*,

332 U.S. 194, 196 (1947)).

This standard of review is highly deferential to the agency, so that a Court need not find

that the agency's decision is "the only reasonable one, or even that it is the result [the Court]

would have reached had the question arisen in the first instance in judicial proceedings." *Am.*

*Paper Inst., Inc. v. Am. Elec. Paper Serv. Corp.*, 461 U.S. 402, 422 (1983).  The Court is not

entitled to substitute its judgment for that of the agency.  *Citizens to Preserve Overton Park, Inc.*

*v. Volpe*, 401 U.S. 402, 416 (1971).  Finally, an agency decision must generally be affirmed on

the grounds stated therein, and a reviewing court may not attempt to supply "a reasoned basis for

the agency's action that the agency itself has not given."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at

43.  Consistent with this review standard, judicial review is confined to the full administrative

record before the agency at the time the decision was made.  *Envtl. Def. Fund, Inc. v. Costle*, 657

F.2d 275, 284 (D.C. Cir. 1981).

### III.  DISCUSSION

Before turning to the merits of the parties' arguments, the Court first pauses briefly to

emphasize once again the limited nature of its review in this case.  The Court is not asked to —

and does not herein — rule upon the ultimate merits of New Life's application for the Broadway

Street Property; Congress has charged HHS, and not this Court, with reviewing and considering

in the first instance the merits of applications for surplus federal property under the McKinney

Act.  As explained above, the only issue now before the Court is whether HHS, in reaching that

decision, "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its

action.'"  *PPL Wallingford Energy*, 419 F.3d at 1198 (quoting  *Motor Vehicle Mfrs. Ass'n*, 463

U.S. at 43)).

In the case at hand, HHS determined, based on its consideration of the five factors set

forth in 45 C.F.R. § 12a.9(e)(2), that New Life's application should be denied because it "failed

to make the necessary showing under" four of the five factors set forth in the regulations —

services offered; need; implementation time; and financial ability.  AR at 1026.  Importantly, that

decision was the result of a multiple-level balancing test.  HHS was required to consider each of

the five factors set forth above before then considering whether, on balance and giving due

weight to the factors as specified by the implementing regulations, New Life's application should

be granted or denied.  The record reflects that HHS ultimately determined , based on its specific

findings regarding each of the five factors, that New Life had not satisfied four of the five

evaluation criteria and that this showing was insufficient, on balance, to support approval of the

application.  In other words, HHS concluded that all of the identified deficiencies in New Life's

application — on balance and giving due weight to each factor — favored denial of the

application.  *See id.* at 1023-26.  Consequently, if the Court finds that HHS erred in reaching any

of the underlying conclusions supporting its ultimate decision to deny the application, then the

Court must remand this matter back to HHS for its reconsideration in light of the Court's

findings.  It is not for the Court to decide in the first instance whether and how changes to the

underlying factors will affect, if at all, HHS' ultimate conclusion regarding New Life's

application.  *Cf. Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("The reviewing court should not

attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the

agency's action that the agency itself has not given.'") (quoting *Chenery Corp.*, 332 U.S. at 196);

*Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) ("Thus, under settled

principles of administrative law, when a court reviewing agency action determines that an agency

made an error of law, the court's inquiry is at an end: the case must be remanded to the agency

for further action consistent with the correct legal standards.") (internal quotations and citations

omitted).

  With this legal framework in mind, the Court now turns to the merits of New Life's

arguments.  New Life, in challenging HHS' decision below, has employed a largely scattershot

approach, asserting that nearly all of the agency's underlying findings supporting its decision to

deny the organization's application are arbitrary, capricious and/or contrary to law.  Although the

Court finds that many of New Life's arguments appear to be without merit based on the present

record, the Court nonetheless agrees with New Life that HHS' decision must be vacated and this

case remanded back to the agency for three principal reasons.

  A. *HHS Improperly Faulted New Life for Failing to Adequately Explain Services
That Were Not Proposed in the Organization's Application*

  First, the Court finds that HHS erred when it faulted New Life for failing to sufficiently

explain how it proposed to deliver primary health care services to its homeless client because the

organization never in fact proposed to provide such services in its application.  As set forth in its

denial letter rejecting New Life's application, HHS criticized the organization for failing to make clear how it "proposes to deliver mental health and substance abuse services, as well as ***primary care services***" in light of "the high rate of primary healthcare needs and behavioral health issues among persons experiencing homelessness."  AR at 1024 (emphasis added).  As New Life points out, however, its application does not include any proposal regarding primary health care services.  Although New Life's application included proposals to provide clients with referrals for mental health and substance abuse services, *see, e.g., id.* at 732 (indicating that New Life would offer "referral[s] to internal and external supportive services including, but not limited to, . . . in-patient or out-patient mental health care or substance abuse treatment (as needed) or support groups . . ."), the application does not reflect any similar proposals to assist the organization's clients with their primary healthcare needs.  *See generally* AR at 716-1006.[10]

New Life argues, and HHS does not dispute, that neither the McKinney Act nor its implementing regulations require that an applicant for surplus federal property demonstrate an intent to provide primary health care services.  Pl.'s Mot. at 16-17; *see* Defs.' Opp'n at 12.  Rather, the Act is aimed at providing services such as "meals, shelter, job training and counseling," and does not obligate applicants for surplus property to also provide health care

---

[10] HHS provides only one citation to the administrative record that even mentions "medical" services.  *See* Defs.' Opp'n at 12 (citing to AR at 724 ("Data may be provided on specific relevant issues, such as medical, housing, substance abuse, relationships, cross-addictions, or life skill issues").  Upon closer review, however, this citation does not support HHS' apparent claim that New Life proposed to assist clients with their primary health care needs.  The quoted language is taken from the section of New Life's application discussing "resident education" and indicates only that New Life intends to provide its clients with "information and education that is applicable to the clients [*sic*] needs," including "[d]ata" on "medical" issues.  AR at 724.  It does not suggest that New Life proposed to assist clients with actually obtaining such services.

services.  *See* 45 C.F.R. § 12a.9(e)(2)(i)).  Admittedly, as HHS emphasizes, applicants such as

New Life are free to propose the provision of a wide variety of services, including medical

services, as part of their application, and once an applicant chooses to do so, HHS is obligated to

ensure that the application adequately explains how the proposed service(s) will be delivered.

*See* Defs.' Opp'n at 12; *see also* AR at 690 (the list of proposed services in 45 C.F.R. §

12a.9(e)(2)(i) is "not exhaustive" and "other services are considered as they are proposed").  In

this case, however, New Life did ***not*** propose assisting clients with their primary health care

needs.  Accordingly, HHS cannot require New Life to provide such services nor deny its

application based on the organization's failure to adequately explain how it will deliver these

medical services where New Life did not propose to actually do so.  *Cf. Motor Vehicle Mfrs.*

*Ass'n*, 463 U.S. at 43 ("the agency must . . . articulate a satisfactory explanation for its

explanation including a 'rational connection between the facts found and the choice made'")

(quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).  HHS therefore

erred when it took into consideration New Life's failure to adequately explain how it would

deliver primary care services, and, for this reason, the matter must be remanded.[11]

---

[11] The Court notes, however, that it does not agree with New Life that HHS similarly erred when it faulted the organization for failing to sufficiently explain how it "proposes to deliver mental health and substance abuse services."  AR at 1024.  Focusing on HHS' use of the term "deliver," New Life argues that this language reflects an intention by HHS to "now require[] every applicant to 'deliver' health, mental health and substance abuse services on-site," rather than through a referral system.  Pl.'s Mot. at 16.  The Court is not persuaded on this point. Although HHS could have used more exacting language and may be well advised to do so on remand, the Court does not understand HHS' use of the term "deliver" to suggest that it required New Life to provide on-site medical services.  Rather, read in proper context, it indicates only that, in HHS' view, New Life had not clearly articulated how it intended to facilitate (*i.e.,* deliver) such services through its proposal to provide its clients with referrals to other agencies. *See* AR at 1024.

B.      *HHS Failed to Address Contradictory Evidence Provided by New Life Regarding the Need for the Proposed Services*

Second, HHS erred when it failed to address contradictory evidence submitted by New Life regarding the population of homeless individuals needing shelter in Cape Girardeau and surrounding areas.  In evaluating whether New Life satisfied the second evaluation criteria, which looks to the need for the proposed services, HHS concluded that, "[w]hile there may be a need in Cape Girardeau for additional homeless services, [New Life] fails to demonstrate the need for a program of the scope and size proposed."  AR at 1024.  As set forth in HHS' denial letter, the agency based this conclusion solely on certain data submitted by New Life that had been drawn from a "point-in-time" survey conducted by the Missouri Housing Development Commission.  *Id.* at 1024-25.  New Life's application, however, also included additional evidence and statistical data suggesting that the point-in-time data relied upon by HHS in fact underestimated the number of homeless in Cape Girardeau and the surrounding areas, such that the actual number of homeless individuals was significantly higher — as high as 2,197 people in Cape Girardeau city alone.  *Id.* at 740-44.

Significantly, HHS did not address this additional data in its denial letter.  Although HHS now proffers an explanation as to why this additional information does not affect its decision that New Life failed to adequately establish a need for its proposed services, the denial letter rejecting the organization's application is entirely silent on this point.  *See id.* at 1024-25.  As explained above, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).  An

agency errs when it ignores contradictory relevant evidence regarding a critical factor in its

decision. *See Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 178 (D.C. Cir. 2005); *see also*

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. HHS*, 396 F.3d 1265, 1278  (D.C. Cir.

2005) (finding agency action "arbitrary and capricious because [it] failed adequately to address

relevant evidence before it").  Accordingly, HHS was in error when it relied solely on the point-

in-time data provided by New Life without addressing the additional, contradictory data included

in the organization's application.  On remand, if HHS chooses to continue to rely only on the

point-in-time studies to support its decision, the agency must explain its decision to discount the

other statistical data provided by New Life.[12]

C.     *HHS Erred When it Concluded that New Life's Application Did Not Include*
       *Funding for its Proposed Capital Projects*

Third and finally, the Court finds that HHS erred when it found that New Life had not

allocated funds for capital improvements within its proposed budget.  AR at 1025.  To the

contrary, as New Life points out, attached to its application is a three-page spreadsheet setting

forth the estimated costs for proposed capital projects and proposed revenue sources for those

projects.  *Id.* at 955-58 ("Attachment M-2").  As shown therein, New Life proposed funding its

capital projects through its "Capital Campaign: Transition to Hope," which consists of a "direct

mail campaign," "major events (fund-raisers)" and "private foundation grants."  *Id.*  It is unclear

---

[12]   In holding that HHS failed to adequately address this contradictory evidence in its
denial letter, the Court makes no finding as to the merits of the agency's explanations advanced
for the first time in HHS' briefing on summary judgment; it may be that such explanations are
sufficient, but that is a decision for the agency — not this Court — to make in the first instance.
See *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (a reviewing court may not attempt to supply "'a
reasoned basis for the agency's action that the agency itself has not given'") (quoting *Chenery
Corp.*, 332 U.S. at 196)).

to the Court, then, why HHS concluded in its denial letter that "[t]here are no funds allocated for capital improvements within the budget." *Id.* at 1025.  Because HHS' conclusion appears to contradict evidence in the record, the Court finds HHS was in error.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (it is error for agency to "offer[] an explanation for its decision that runs counter to the evidence before the agency").  On remand, HHS must explain its conclusion that New Life did not allocate funding for its proposed capital improvements in light of this information or remove its reliance on this finding as support for its decision.[13]

For the reasons outlined above, the Court concludes that HHS' decision must be vacated and this case remanded to the agency for further consideration.  Although New Life has raised a plethora of additional challenges to HHS' decision, the Court finds it unnecessary to address many of New Life's remaining arguments in light of the current procedural posture of this case.[14] New Life's motion for summary judgment is therefore GRANTED insofar as it seeks vacatur of the decision below and remand.  Accordingly, HHS' decision denying New Life's application is vacated, and this case is remanded to the agency for further action consistent with this

---

[13] Whether or not HHS ultimately finds that the proposed funding is adequate is a separate question not presently before the Court.

[14] The Court does note, however, that HHS has at times proffered additional explanations for its decision denying New Life's application in its summary judgment briefing that do *not* appear in its denial letter below.  For example, HHS now provides the Court with additional argument supporting its conclusion that New Life did not satisfy the implementation time requirement, but such explanations are not included in the denial letter.  To the extent HHS intends to rely on such reasoning on remand or determines that further explanation of any of its findings is necessary, HHS would be well served to augment the record below with such additional explanation as may be appropriate.  *Cf. Local 814, Int'l Bhd. of Teamsters v. Nat'l Labor Relations Bd.*, 546 F.2d 989, 992 (D.C. Cir. 1976) (on remand, agency may "submit[] an amplified articulation" of its reasoning; "[i]f a reviewing court finds the record inadequate to support a finding of reasoned analysis by an agency and the court is barred from considering rationales urged by others, only the agency itself can provide the required clarification.").

21

Memorandum Opinion.  Pursuant to 45 C.F.R. § 12a.9(a)(2), the property at issue "may not be made available for any other purpose until the application has been resolved."

## IV. CONCLUSION

For the reasons set forth above, New Life's motion for summary judgment is GRANTED insofar as it seeks vacatur of the decision below and remand.  Accordingly, HHS' decision denying New Life's application is vacated, and this case is remanded to the agency for further action consistent with this Memorandum Opinion.  Pursuant to 45 C.F.R. § 12a.9(a)(2), the property at issue "may not be made available for any other purpose until the application has been resolved."  An appropriate Order accompanies this Memorandum Opinion.

Date: December 8, 2009

_/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge