# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NEW LIFE EVANGELISTIC
CENTER, INC.,

     *Plaintiff*,

     v.

KATHLEEN SEBELIUS, Secretary of the
U.S. Department of Health and Human
Services,

     and

MARTHA N. JOHNSON, Administrator,
U.S. General Services Administration,

     *Defendants*.

Civil Action No. 09-01294 (CKK) (DAR)

## MEMORANDUM OPINION
(December 1, 2010)

Plaintiff New Life Evangelistic Center, Inc. ("New Life") commenced this action on July

13, 2009, naming as defendants Kathleen Sebelius, in her official capacity as Secretary of the

U.S. Department of Health and Human Services ("HHS"), and Martha N. Johnson, in her official

capacity as Administrator of the U.S. General Services Administration ("GSA") (collectively,

"Defendants").[1]  In the first instance, New Life challenged HHS' denial of New Life's

application, made pursuant to Title V of the McKinney-Vento Homeless Assistance Act, 42

U.S.C. §§ 11301 *et seq.* (the "McKinney Act" or the "Act"), to use a particular piece of federal

---

[1] Ms. Johnson was automatically substituted as a defendant in this action upon her appointment as Administrator of the GSA.  *See* Fed. R. Civ. P. 25(d) ("when a public officer who is a party in an official capacity . . . resigns, or otherwise ceases to hold office," during the pendency of an action, "[t]he officer's successor is automatically substituted as a party").

property in Cape Girardeau, Missouri for establishing a homeless assistance program. On December 8, 2009, after conducting a searching review of the administrative record and the parties' respective submissions, this Court vacated the denial and remanded the action for further proceedings below. On remand, HHS again denied New Life's application and issued a second denial letter. Presently before the Court is New Life's [35] Second Motion for Vacatur and Remand, through which New Life challenges both the substantive bases for the second denial letter and the procedural underpinnings of the proceedings conducted on remand. After reviewing the parties' submissions, including the attachments thereto, the administrative record, the relevant authorities, and the record of the case as a whole, the Court shall DENY New Life's Second Motion for Vacatur and Remand and DISMISS this action in its entirety, for the reasons set forth below.

## I. BACKGROUND

The Court assumes familiarity with its prior opinion in this action, which sets forth in detail the factual and procedural background of this case, *see New Life Evangelistic Ctr., Inc. v. Sebelius*, 672 F. Supp. 2d 61 (D.D.C. 2009), and shall therefore only address the factual and procedural background necessary to address the issues currently before the Court.

*A.      The McKinney Act and the Accompanying Regulatory Framework*

Congress passed the McKinney Act in 1987, recognizing that "the federal government 'has a clear responsibility and an existing capacity' to help meet an immediate and unprecedented crisis due to the lack of shelter for a growing number of individuals and families." *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25, 27 (D.D.C. 2000) (quoting 42 U.S.C. § 11301(a)). In particular, Title V of the Act, 42 U.S.C. §§ 11411-11412, and

2

its implementing regulations, 45 C.F.R. §§ 12a.1 *et seq.*, provide a comprehensive legal framework for making "unutilized, underutilized, excess or surplus" federal real property available for use by representatives of the homeless. *Id.* § 12a.2(a). In the process, the Act appropriates and modifies, in part, the administrative procedures established by the Federal Property and Administrative Services Act of 1949, 40 U.S.C. §§ 541 *et seq.*, which authorizes HHS to dispose of surplus property "as needed for use in the protection of public health," *id.* § 550(d)(1), a congressional mandate interpreted to include use by organizations that provide "services (including shelter) to homeless individuals," 45 C.F.R. § 12.3(e).

Under the McKinney Act, HHS is charged with soliciting and evaluating applications by representatives of the homeless for the use of properties designated as suitable "surplus" federal property. 42 U.S.C. § 11411(e). The process starts, however, with the Secretary of Housing and Urban Development ("HUD"), which is responsible for canvassing landholding agencies to collect data on properties that are designated as unutilized, underutilized, excess, or surplus. 45 C.F.R. § 12a.3. HUD is required to publish in the Federal Register a description of any available property that has been identified as suitable for use as a facility to assist the homeless. 42 U.S.C. § 11411(c); 45 C.F.R. § 12a.8(a). Thereafter, any representative of the homeless that may be interested in such property must send HHS a written "expression of interest" within sixty days. 45 C.F.R. § 12a.9(a). Upon receipt of a written expression of interest, the property may not be made available for any other purpose until the application has been resolved. *Id.* § 12a.9(a)(2).

Once HHS has received an expression of interest, it sends the interested party an application packet, which requires the applicant to provide certain information, including, among other things, (i) a description of the applicant organization, (ii) a description of the property

3

desired, (iii) a description of the proposed program, (iv) a description of the applicant organization's ability to finance and operate the proposed program, and (v) a certification of compliance with non-discrimination requirements. *Id.* § 12a.9(b); *see also* Appl. Instruction Booklet at AR686-715.[2]

Applications must be received by HHS within ninety days after receipt of an expression of interest. 42 U.S.C. § 11411(e)(2); 45 C.F.R. § 12a.9(d). Upon receipt, HHS "review[s] [the application] for completeness and, if incomplete, may return it or ask the applicant to furnish any missing or additional required information prior to final evaluation of the application." 45 C.F.R. § 12a.9(e)(1). However, "[d]ue to the short time frame imposed for evaluating applications, HHS' evaluation will, generally, be limited to the information contained in the application." *Id.* § 12a.9(c). Indeed, the Application Instruction Booklet advises:

> [Incomplete applications] will either result in disapproval of the application or a request for additional information. It is to the applicant's benefit to err on the side of providing too much information as opposed to omitting information or not providing enough detail. It is the applicant's responsibility to ensure their [sic] application presents all the information requested in a detailed and complete manner.

Appl. Instruction Booklet at AR691.

HHS must "evaluate each completed application within 25 days of receipt and . . . promptly advise the applicant of its decision." 45 C.F.R. § 12a.9(e)(2); *see also* 42 U.S.C. § 11411(e)(3). By regulation, all applications must be evaluated on the basis of the following five, non-exhaustive criteria (which are listed in descending order of priority, except for the final two

---

[2] Citations to "AR" refer to the Administrative Record. *See* Docket Nos. [14], [15], [33], [37].

factors, which are of equal importance):

    (i)    **Services offered.** The extent and range of proposed services, such as meals, shelter, job training, and counseling.

    (ii)    **Need.** The demand for the program and the degree to which the available property will be fully utilized.

    (iii)    **Implementation Time.** The amount of time necessary for the proposed program to become operational.

    (iv)    **Experience.** Demonstrated prior success in operating similar programs and recommendations attesting to that fact by Federal, State, and local authorities.

    (v)    **Financial Ability.** The adequacy of funding that will likely be available to run the program fully and properly and to operate the facility.

45 C.F.R. § 12a.9(e)(2) (emphasis added). In addition, the regulations provide that, when "construction or major renovation is not required or proposed, the property must be placed into use within twelve (12) months from the date of transfer." *Id.* § 12.3(c). When major construction or renovation is required or proposed, the property must be placed into use within thirty-six months from the date of transfer. *Id.* Finally, the regulations reserve to HHS the right to add "[a]dditional evaluation factors . . . as deemed necessary," provided the application packet is revised accordingly. *Id.* § 12a.9(e)(3).

    B.    *Factual and Procedural Background*

    1.    <u>The Initial Denial of New Life's Application</u>

New Life is a self-described 501(c)(3) organization that provides services to homeless men, women, and children throughout Missouri, Illinois, Kansas, and Arkansas. Compl., Docket No. [1], ¶ 1; *see also* Appl. for Surplus Fed. Property ("Appl.") at AR717. On December 19,

2008, HUD published an availability announcement for the federal building and courthouse located at 339 Broadway Street in Cape Girardeau, Missouri (the "Broadway Street Property"), which had been identified as no longer serving a federal need. *See* Fed. Property Suitable as Facilities to Assist the Homeless, 73 Fed. Reg. 77821-01 (Dec. 19, 2008).

On January 26, 2009, New Life filed its expression of interest requesting an application for use of the property, *see* Jan. 26, 2009 Ltr. from B. Calkins to H. Ransom at AR681, and filed a formal application on May 1, 2009, *see* Appl. at AR716-1006. In its application, New Life proposed serving "temporary and/or chronically homeless persons in Cape Girardeau, Missouri and the surrounding twenty-two rural counties." *Id.* at AR721. More specifically, New Life proposed providing transitional housing and related services through its "Core Program" to approximately 125 homeless individuals per year, 20 of whom would also be eligible to receive job training through New Life's Leadership Job Training Program, as well as emergency shelter and a free store to an additional 1,100 homeless individuals per year. *Id.* at AR721-22.

By letter to New Life President Rev. Lawrence W. Rice, Jr., dated May 28, 2009, HHS denied New Life's application for failure to meet the threshold requirements for four of the five criteria set forth in the relevant regulations – namely, services offered, need, implementation time, and financial ability. *See* May 28, 2009 Ltr. from P. Bartley to L. Rice at AR1023-26.

2.    The Court's Remand Order

On July 13, 2009, New Life commenced this action seeking judicial review of HHS' decision. *See* Compl. Shortly thereafter, on July 21, 2009, it moved for a preliminary injunction, *see* Pl.'s Mot. for Prelim. Inj., Docket No. [9], which was subsequently converted into and treated as New Life's opening brief on the merits, *see* Order (July 24, 2009), Docket No. [11], at

6

1-2.  On October 9, 2009, Defendants filed an opposition and the administrative record.  *See*

Defs.' Mem. of P. & A. in Opp'n to Pl.'s Opening Merits Br., Docket No. [13]; AR1-1028,

Docket Nos. [14], [15].  New Life filed a reply on November 9, 2009, and Defendants filed a

surreply on November 18, 2009.  *See* Pl.'s Reply in Supp. of its Mot. for Summ. J., Docket No.

[17]; Defs.' Surreply in Supp. of their Mem. in Opp'n to Pl.'s Opening Merits Br., Docket No.

[20].

On December 8, 2009, after conducting a searching review of the administrative record

and the parties' respective submissions, this Court vacated HHS' decision and remanded the

action for further proceedings below.  *See New Life Evangelistic Ctr.*, 672 F. Supp. 2d at 61.  In

remanding, the Court identified three specific defects in HHS' decision.  First, because New

Life's underlying application did not include any proposal regarding primary health care services,

HHS erred in criticizing New Life for failing to make clear how it proposed to deliver such

services.[3]  *Id.* at 72-73.  Second, HHS erred in relying exclusively on a "point-in-time" survey

conducted by the Missouri Housing Development Commission to conclude that New Life failed

to demonstrate a sufficient need for a program of the size and scope proposed, as New Life had

submitted other evidence and statistical data; to the extent HHS intended to rely only on the

point-in-time survey, it was required to explain its decision to discount contradictory evidence.

*Id.* at 73-74.  Third, because New Life's proposal included a description of estimated costs for

proposed capital projects and revenue sources for those projects, HHS erred in concluding that

New Life failed to allocate funds for capital improvements in its budget.  *Id.* at 74-75.  The Court

---

[3]  At the same time, the Court concluded that HHS did not err in faulting New Life for
failing to sufficiently explain how it proposed to deliver mental health and substance abuse
services.  *New Life Evangelistic Ctr.*, 672 F. Supp. 2d at 73 n.11.

declined to address New Life's additional challenges to the decision, electing instead to remand the action for further proceedings below.  *Id.*  Although it did note that "HHS would be well served to augment the record below with such additional explanation as may be appropriate," the Court did not impose any specific conditions or limitations on the nature of the proceedings on remand.  *Id.* at 74 n.14; *see also* Order (Dec. 8, 2009), Docket No. [23].

### 3.    The Proceedings on Remand

Shortly after the Court's remand order, on December 11, 2009, New Life wrote to HHS concerning the nature of the proceedings on remand.  *See* Dec. 11, 2009 Ltr. from E. Waters to D. Rybicki at AR1059-60.  Specifically, New Life "propose[d] that before HHS reevaluates the application per the Court's [remand] order, New Life [] supplement its application."  *Id.* at AR1059.  By letter dated December 28, 2009, HHS rejected New Life's proposal, indicating that New Life's original application was "complete" and taking the position that the relevant regulations reserve to HHS the discretion to request further information.  *See* Dec. 28, 2009 Ltr. from D. Rybicki to E. Waters at AR1061-62.

By letter dated May 14, 2010, HHS again denied New Life's application and issued a second denial letter (the "Second Denial Letter").  *See* May 14, 2010 Ltr. from P. Bartley to L. Rice ("2d Denial Ltr.") at AR1215-1225.  As before, albeit in considerably greater detail and based on somewhat distinct reasoning, HHS denied New Life's application for failure to meet the threshold requirements for four of the five criteria set forth in the relevant regulations – namely, services offered, need, implementation time, and financial ability.  *Id.*  On July 19, 2010, New Life filed the present motion for vacatur and remand, challenging both the substantive bases for the Second Denial Letter and the procedural underpinnings of the proceedings conducted on

remand.  *See* Pl.'s Mem. of P. & A. in Supp. of Pl.'s Second Mot. for Vacatur & Remand ("Pl.'s

Mem."), Docket No. [35-1].  Defendants filed an opposition, and supplemented the

administrative record to include additional materials referenced in denying New Life's

application.  *See* Defs.' Mem. of P. & A. in Opp'n to Pl.'s Second Mot. for Vacatur & Remand

("Defs.' Opp'n"), Docket No. [41]; Defs.' Not. of Suppl. Filing of Admin. Record, Docket No.

[33]; Defs.' Not. of Suppl. Filing of Admin. Record, Docket No. [37].  On August 26, 2010,

Plaintiff filed a reply.  *See* Pl.'s Reply to Defs.' Opp'n to Pl.'s Second Mot. for Vacatur &

Remand ("Pl.'s Reply"), Docket No. [42].  The motion is now fully briefed and ripe for

adjudication.

## II.  LEGAL STANDARD

Both parties agree that HHS' decision to deny New Life's application for the Broadway

Street Property is properly analyzed under the "arbitrary or capricious" standard set forth in the

Administrative Procedure Act (the "APA").  *See* 5 U.S.C. § 706(2)(A) ("The reviewing court

shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . .

arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  New

Life, as the party challenging the agency action, bears the burden of proof.  *Abington Crest*

*Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009) (citing *City of Olmsted*

*Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002)).  In assessing the merits of

New Life's challenge, the Court begins with the presumption that HHS' action was valid.  *Grid*

*Radio v. Fed. Commc'ns Comm'n*, 278 F.3d 1314, 1322 (D.C. Cir.), *cert. denied*, 537 U.S. 815

(2002).

Agency action must generally be affirmed on the grounds originally stated by the agency;

a reviewing court may not attempt to supply "a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nor may counsel's "*post hoc* rationalizations," offered for the first time on judicial review, substitute for an agency's obligation to articulate a valid rationale in the first instance. *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005). Consistent with these principles, judicial review is typically confined to the administrative record before the agency at the time the decision was made. *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981).

In order to avoid a finding that the challenged agency action was arbitrary or capricious, the "agency must [have] examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (internal quotation marks omitted). In articulating the reason for its action, the agency "must have provided a 'rational connection between the facts found and the choice made.'" *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, __ F.3d __, 2010 WL 4180677, at *4 (D.C. Cir. Oct. 26, 2010) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (internal notations omitted). An agency's decision may be said to be arbitrary or capricious if any of the following apply: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at

43; *accord Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010).

This standard of review is highly deferential to the agency; a court need not find that the agency's decision is "the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983). That is, it is not enough for the agency decision to be incorrect; so long as it has some rational basis, the court is bound to uphold the decision. *Hosp. of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 13 (D.D.C. 2009) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). At bottom, the reviewing court is not entitled to substitute its judgment for that of the agency. *Overton Park*, 401 U.S. at 416.

Finally, in evaluating agency action under the "arbitrary or capricious" standard, the reviewing court must take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. Just as the burden of establishing that the agency action is arbitrary or capricious rests with the party challenging agency action, so too must that party establish that the errors ascribed were prejudicial. *Jicarilla Apache Nation*, 613 F.3d at 1121 (citing *PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004)). The question of whether an error was prejudicial is necessarily contextual, and courts must proceed with a case-specific application based upon an examination of the record. *Jicarilla Apache Nation*, 613 F.3d at 1121. However, where the party challenging agency action fails to show that the agency's error may have affected the outcome of the proceedings below, the error is not prejudicial, and it would be senseless to vacate and remand for further proceedings. *Id.*

11

With these principles in mind, the Court turns to the merits of the present motion.

### III.  DISCUSSION

New Life tenders three principal arguments in support of its claimed entitlement to a second vacatur and remand: (i) New Life first claims, in essence, that HHS acted arbitrarily or capriciously on remand by engaging in a procedurally defective decisionmaking process, *see infra* Part III.A; (ii) New Life next contends that, even if HHS' conduct on remand was not procedurally defective, the Second Denial is nevertheless substantively arbitrary or capricious, *see infra* Part III.B; and (iii) finally, New Life appears to argue that, even if HHS' decision was not otherwise arbitrary or capricious, the Court should nevertheless permit New Life to file a revised application to account for changed circumstances arising in the time since this action was first commenced, *see infra* Part III.C.  The Court addresses each argument in turn.

A.      *New Life Has Failed to Establish that the Proceedings on Remand Were Procedurally Defective*

New Life first claims that HHS acted arbitrarily or capriciously on remand by "engag[ing] in a one-sided reevaluation process that gave the agency every advantage, []while denying New Life any similar benefit."  Pl.'s Mem. at 4.  In other words, New Life claims that HHS' decisionmaking process on remand was procedurally defective.  New Life's four specific complaints are as follows: (i) HHS improperly supplemented the administrative record on remand with materials unfavorable to New Life's position, *see infra* Part III.A.1; (ii) HHS improperly rejected New Life's request to supplement its application on remand, *see infra* Part III.A.2; (iii) HHS unreasonably delayed the issuance of its decision on remand, purportedly in violation of statutorily required time limits, *see infra* Part III.A.3; and (iv) the circumstances of HHS' decisionmaking process on remand suggest that the agency was acting not out of a desire

to act as a neutral decisionmaker, but rather to insulate its decision from judicial review, *see infra* Part III.A.4. For the reasons set forth below, the Court concludes that none of the foregoing complaints renders HHS's decision arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.

### 1. HHS' Supplementation of the Record on Remand

New Life first contends that HHS acted arbitrarily or capriciously by supplementing the administrative record on remand with approximately two hundred additional pages of materials unfavorable to New Life's position. Pl.'s Mem. at 4-7. For at least two reasons, the contention is unavailing: first, the Court finds no error in HHS' course of conduct; and, second, even assuming that HHS erred, New Life has failed to carry its burden of establishing that such error was prejudicial.

### a. HHS Retained the Discretion to Supplement the Record on Remand

It is beyond dispute that a reviewing court may allow an agency to supplement the record with additional evidence following remand. *See, e.g.*, *Union Elec. Co. v. Fed. Energy Regulatory Comm'n*, 890 F.2d 1193, 1196 (D.C. Cir. 1989) ("On remand the Commission may wish to supplement the record with such [additional] evidence."). Equally non-controversial, however, is the proposition that an agency's review on remand must be responsive to the court's mandate. *Process Gas Consumers Grp. v. Fed. Energy Regulatory Comm'n*, 292 F.3d 831, 840 (D.C. Cir. 2002). The only question here is whether HHS was permitted to supplement the record by the terms of this Court's remand order.

The Court's remand order and accompanying memorandum opinion are, quite simply, silent on the question of how HHS was to treat the evidentiary record on remand. While the

Court did suggest that "HHS would be well served to augment the record below with such additional *explanation* as may be appropriate," the Court did not impose any specific conditions or limitations on the nature of the proceedings below. *New Life Evangelistic Ctr.*, 672 F. Supp. 2d at 74 n.14 (emphasis added); *see also* Order (Dec. 8, 2009), Docket No. [23]. As such, nothing in the metes and bounds of this Court's remand order precluded HHS from supplementing the record on remand.

At the same time, "[w]hen the court does not require additional fact gathering on remand . . . the agency is typically authorized to determine, in its discretion, whether such fact gathering is needed." *Chamber of Commerce of the U.S. v. Secs. & Exch. Comm'n*, 443 F.3d 890, 900 (D.C. Cir. 2006); *see also PPG Indus., Inc. v. United States*, 52 F.3d 363, 366 (D.C. Cir. 1995) ("there is no principle of administrative law that restricts an agency from reopening proceedings to take new evidence after the grounds upon which it relied are determined by a reviewing court to be invalid."). Such an approach is consonant with the general preference to leave to the agency's discretion to decide how, in light of internal organizational considerations, it may best proceed upon remand. *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (per curiam). Accordingly, although this Court's remand order admittedly could have been more clear by expressly affording HHS leave to supplement the factual record on remand, and certainly the better practice would have been for the parties to have sought clarification prior to engaging in extended proceedings below, the Court concludes that HHS was permitted to exercise its discretion to collect and consider additional evidence on remand. Its election to do so cannot be characterized as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

b.     New Life Has Failed to Establish Prejudicial Error

As a separate and independent grounds for upholding HHS' decision in this regard, New

Life has failed to satisfy its burden of establishing that the ascribed error was prejudicial.  First,

although the two hundred pages added to the administrative record consist of a variety of

documents,[4] New Life has only specifically objected to two: letters from two homeless assistance

providers in the Cape Girardeau area, Safe House for Women ("Safe House") and Mending

Hearts Recovery ("Mending Hearts"), in which those providers disclaim any formal referral

relationship with New Life.  Pl.'s Mem. at 4.  To the extent New Life objects to any other

documents, it has, quite simply, failed to discharge its burden of establishing that HHS' decision

to supplement the record with those documents was, even if presumed to be erroneous,

prejudicial.

Meanwhile, with respect to the letters from Safe House and Mending Hearts, it is true that

both letters are referenced in the Second Denial Letter.  Specifically, in addressing the extent and

range of services proposed by New Life – *i.e.*, the "services offered" criterion – HHS highlighted

that New Life had identified Safe House and Mending Hearts as service providers with which it

had established referral relationships, and provided that "[i]n unsolicited correspondence to HHS,

the executive directors of [Safe House] and [Mending Hearts] disputed the claims made by [New

Life] in its application."  2d Denial Ltr. at AR1216.  This, however, was hardly the linchpin of

HHS' analysis; rather, HHS broadly determined that, while "it is acceptable for an applicant to

---

[4] Simply by way of example, the two-hundred pages added to the administrative record
upon remand include: a copy of this Court's December 8, 2009 Memorandum Opinion, AR1029-
50; the Second Denial Letter, AR1215-25; copies of correspondence between New Life and HHS
following remand, AR1059-62; and a copy of the definition of "homelessness" under the
McKinney Act, AR1056-58.

propose providing services via referrals . . . [New Life's] application fails to adequately support its proposal and demonstrate that [it] would successfully implement the referral program it proposes." *Id.* at AR1217. Indeed, in the Second Denial Letter, HHS expressly stated that the letters from Safe House and Mending Hearts "not only call into question [New Life's] ability to provide referrals to mental health and substance abuse services, they also serve to highlight why it is inadequate to rely simply on informal partnerships, arrangements, or telephone conversations." *Id.* In other words, HHS referenced the two letters as illustrative examples of what it viewed as a more fundamental failing with New Life's application – *i.e.*, the failure to adequately describe how New Life intended to implement the referral program it proposed. Nor was this the only basis that HHS cited as grounds for rejecting New Life's showing under the "services offered" criterion; HHS separately determined that New Life's proposed staffing model was inadequate for the scope and extent of services proposed. *Id.* at AR1217. In short, because the reference to the letters from Safe House and Mending Hearts was far from essential to the agency's analysis under the "services offered" criterion, New Life has failed to establish that their inclusion in the administrative record, even if erroneous, was prejudicial. *See Pittsburgh & Lake Erie R.R. Co. v. Interstate Commerce Comm'n*, 796 F.2d 1534, 1543 (D.C. Cir. 1986) (ascribed procedural error not prejudicial where it related to issues "irrelevant" or "tangential" to the agency's conclusion); *Olson v. Clinton*, 602 F. Supp. 2d 93, 104 (D.D.C. 2009) (plaintiff failed to demonstrate that alleged procedural errors tainted the decision below and thereby caused him prejudice).

Further preventing New Life from demonstrating prejudice is the question of what relief it would be entitled to in the event of an error. In the formal rulemaking context, a party may

demonstrate prejudicial error by showing that the agency relied upon documents that were not previously disclosed, and establishing that it could have mounted a "credible challenge" to those documents. *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 202-03 (D.C. Cir. 2007). But, as set forth in greater detail below, *see infra* Part III.A.2, New Life simply has no comparable procedural right in this setting, an informal adjudication for which neither notice-and-comment nor an on-the-record hearing is required. As such, even if the Court's remand order could somehow be construed to restrict HHS' discretion on remand, the Court would simply issue an amended order expressly allowing HHS leave to consider additional evidence, at which juncture New Life would have no right of response or rebuttal. There is no need to compel an agency to go through the "empty exercise of repeating a procedure according to rules where the result of the procedure is foreordained," *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 63 (D.D.C. 1998), and therefore New Life's first argument fails on this ground as well.

2.    New Life's Request to Submit a Supplemental Application

In truth, New Life's complaint is less that HHS supplemented the record with additional materials in support of its Second Denial Letter, but rather that it did so while simultaneously "reject[ing] New Life's request to supplement its application." Pl.'s Mem. at 4. As described above, shortly after the Court's remand order, New Life wrote to HHS proposing to supplement its application before HHS commenced the reevaluation process. *See* Dec. 11, 2009 Ltr. from E. Waters to D. Rybicki at AR1059-60. HHS rejected the proposal, taking the position that New Life's original application was "complete" and that the relevant regulations reserve to the agency the right to request additional information. *See* Dec. 28, 2009 Ltr. from D. Rybicki to E. Waters

at AR1061-62. New Life's argument is premised upon a fundamental misunderstanding of its procedural rights in this specific setting, an informal adjudication in which New Life had no entitlement to respond to or rebut HHS' evidentiary showing, or to submit countervailing evidence in support of its position beyond whatever it included in its original application. Because New Life had no such right under the APA or the McKinney Act and its accompanying regulations, New Life's argument fails.

        a.        The APA Does Not Confer Upon New Life a Right to Supplement the Record

The APA's provisions do not specify the procedures that are to govern the great bulk of agency adjudications – *i.e.*, those for which an on-the-record hearing is not statutorily required. *See Occidental Petroleum Corp. v. Secs. & Exch. Comm'n*, 873 F.2d 325, 337 (D.C. Cir. 1989) ("no provision of the APA contains specific procedures to govern an informal agency adjudication"); *see generally* Peter L. Strauss, *Administrative Justice in the United States* 210-12 (2d ed., Carolina Academic Press 2002). The provisions governing formal rulemaking proceedings, adjudications for which an on-the-record hearing is statutorily required, and proceedings relating to applications for a license required by law, *see* 5 U.S.C. §§ 553-554, 556-558, have no direct application to the informal adjudication setting. Meanwhile, the one provision of any possible relevance to the immediate context imposes only modest obligations on the acting agency:

> Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.

*Id.* § 555(e). In sum, in this setting, the APA requires only (i) prompt notice of the denial of any

18

written application, and (ii) a brief statement of the grounds for denial.  Unlike other agency

proceedings, the APA does not confer upon participants in informal adjudications the right to

"present his case or defense by oral or documentary evidence, to submit rebuttal evidence, [or] to

conduct such cross-examination as may be required for a full and true disclosure of the facts."

*Id.* § 556(d).

> b.      Neither The McKinney Act Nor its Regulations Confer Upon New
>          Life a Right to Supplement the Record

The inquiry cannot end with the APA: if the McKinney Act or the relevant regulations

confer upon applicants for the use of surplus federal properties certain procedural rights above

and beyond those contemplated by the APA, then those rights must be honored.  However, at

least in terms of the application process, the procedures contemplated by the McKinney Act are

few: (i)  HHS must, with the concurrence of the relevant landholding agency, "grant reasonable

extensions" of the time to submit an application, 42 U.S.C. § 11411(e)(2); (ii) HHS must

"review, make all determinations, and complete all actions on the application" within twenty-five

days after receipt, *id.* § 11411(e)(3); and (iii) HHS must "maintain a written public record of all

actions taken in response to an application," *id.*  Nothing in the McKinney Act requires HHS to

allow New Life to submit any information, evidence, or argument beyond whatever may be

included in the original application.

The relevant regulations are more fulsome in articulating the procedures attaching to the

application process, but not significantly so.  Most notably for our present purposes, the

regulations provide as follows: (i) "[u]pon request from the applicant, HHS may grant extensions

[to submit applications], provided that the appropriate landholding agency concurs with the

extension," 45 C.F.R. § 12a.9(d); (ii) "[u]pon receipt of an application, HHS will review it for

completeness, and, if incomplete, may return it or ask the applicant to furnish any missing or additional required information prior to final evaluation of the application," *id.* § 12a.9(e)(1); (iii) HHS must "evaluate each completed application within 25 days of receipt and . . . promptly advise the applicant of its decision," *id.* § 12a.9(e)(2); and (iv) HHS must evaluate each application on the basis of the specified evaluation factors, as well as any additional factors identified in the application packet, *id.* § 12a.9(e)(2)-(3).

Of these procedural requirements, only one has any relevance here – namely, the requirement that, "[u]pon receipt of an application, HHS . . . review it for completeness." *Id.* § 12a.9(e)(1). The regulation goes on to provide that, "if incomplete, [HHS] may return [the application] or ask the applicant to furnish any missing or additional required information prior to final evaluation of the application." *Id.* Two matters are worthy of note here. First, the quoted language applies, if at all, only when HHS determines that an application is incomplete; where the application is complete, the regulations are silent as to the furnishing of additional information. This interpretation is not only mandated by the conditional "if complete" that begins the sentence, but also by the provision's use of the terms "missing" and "additional required information," which would have no applicability to complete applications. Second, even with respect to incomplete applications, the sentence structure and the use of the term "may" unambiguously evinces an intention to vest in HHS the discretion whether or not to seek further information from applicants. *See Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 346 (2005) ("The word 'may' customarily connotes discretion."). Such an interpretation is virtually compelled by the separate provision of the regulations warning applicants that "[d]ue to the short time frame imposed for evaluating applications, HHS' evaluation will, generally, be

limited to the information contained in the application." 45 C.F.R. § 12a.9(c).

To summarize, nothing in either the McKinney Act or the regulations requires HHS to allow applicants to submit supplemental materials once an application has been deemed complete; even where applications are incomplete, HHS retains the discretion to decide whether to request and accept additional materials.

> c.    HHS Did Not Act Arbitrarily or Capriciously in Denying New Life's Request to Supplement its Application

On remand, HHS again determined that New Life's application was "complete," as that term is used in the McKinney Act and its accompanying regulations. *See* Dec. 28, 2009 Ltr. from D. Rybicki to E. Waters at AR1061-62. Notably, New Life has never suggested that its application was not "complete," a fact highlighted by HHS in its opposition papers but left conspicuously unaddressed by New Life in its reply. *See* Defs.' Opp'n at 6 ("[New Life] has never argued that its application is incomplete, nor does it so argue here."); Pl.'s Reply at 1-4. Instead, in the proceedings below, New Life sought to introduce additional materials "that New Life would have filed had HHS engaged in a more appropriately interactive process." Dec. 11, 2009 Ltr. from E. Waters to D. Rybicki at AR1059. That is, New Life did not claim then, and does not claim now, that the information it sought to provide on remand was "additional required information" or information "missing" from its original application. 45 C.F.R. § 12a.9(e)(1).

If anything, the materials – characterized by New Life as "evidence . . . elaborating on the changed circumstances in Cape Girardeau . . . and the increasing need for New Life's proposed Title V program," Pl.'s Reply at 7 – are designed to rebut or respond to the deficiencies in New Life's application that were identified by HHS in the initial proceedings below and in the course of litigation before this Court, a transparent attempt to reopen an evidentiary submission phase to

21

the informal adjudication below that never existed in the first place.  What New Life wants, in essence, is "a more . . . interactive process," Dec. 11, 2009 Ltr. from E. Waters to D. Rybicki at AR1059, one in which it is permitted to engage in a dialogue with HHS over the merits of its application for use of the Broadway Street Property.  It is here that New Life's argument becomes particularly problematic, rendering it necessary for this Court to examine its role in assessing the procedural sufficiency of an agency's decisionmaking process in matters where the governing statute and regulations are silent.

New Life does not argue that the relief it seeks is required by the McKinney Act itself or by the supporting regulations (plainly, it is not), and therefore New Life's argument rises and falls upon the APA.  Unfortunately for New Life, the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness," *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, __ U.S. __, 129 S. Ct. 1800, 1810 (2009), and, as set forth above, the APA simply does not confer upon participants in informal adjudications a right to supplement the evidentiary record, or to submit countervailing evidence or argument.  To put it bluntly, nothing contemplated by the APA is even remotely comparable to an "interactive process" between the participant and the agency.  As such, it is unsurprising that New Life resorts to notions of "fundamental fairness" in an attempt to resurrect its claim, Pl.'s Mem. at 5-7, but this avenue is foreclosed by decades of settled jurisprudence precluding courts from imposing upon agencies specific procedural requirements not contemplated by the governing statutory and regulatory framework.

In the seminal case of *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519 (1978), the Supreme Court held that a court reviewing an agency

rulemaking proceeding may not impose upon the agency procedural requirements beyond those that Congress specifically set forth in the APA. Describing agencies' freedom to fashion their own procedural rules as "the very basic tenet of administrative law," *id.* at 544, the Supreme Court described the limits of the reviewing court's role in no uncertain terms: absent constitutional constraints or extremely compelling circumstances, agencies are free to fashion their own procedural rules and pursue methods of inquiry as they see fit, *id.* at 524, 543. Consistent with these principles, the court should not "explore the procedural format or . . . impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." *Id.* at 549.

The general principles announced in *Vermont Yankee* were extended to the informal adjudication setting in *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990), where the Supreme rejected an argument remarkably similar to the one now pressed by New Life. There, the Court of Appeals concluded that the agency's decision, made in the context of an informal adjudication, was arbitrary or capricious because it did not, *inter alia*, apprise the petitioner of the material on which it was to base its decision or provide the petitioner with an opportunity to offer contrary evidence. *Id.* at 653. Reconciling *Vermont Yankee* with its prior opinion in *Overton Park*, 401 U.S. 402, the *Pension Benefit* Court provided that, in the informal adjudication context, the relevant question is whether the agency's procedures below, whatever they may be, suffice to "provide an explanation that will enable the [reviewing] court to evaluate the agency's rationale at the time of the decision." *Pension Benefit*, 496 U.S. at 654. The Court was unequivocal that *Vermont Yankee*'s basic thrust still applied: in the informal adjudication setting, "courts are not free to impose upon agencies specific procedural requirements that have

no basis in the APA" or the governing legislation. *Id.* In so holding, the Supreme Court faulted the Court of Appeals for focusing on notions of "fundamental fairness" and for critiquing the agency for failing to afford the petitioner a greater role in its decisionmaking process; because those criticisms had no basis in the APA or the relevant legislation, the Court of Appeals had run afoul of *Vermont Yankee*. *Id.* at 655; *see also Occidental Petroleum*, 873 F.2d at 338 (*Vermont Yankee* would forbid the reviewing court from "imposing upon the agency specific procedural steps that must be followed in order to create a reviewable record" of an informal adjudication proceeding). The relief now sought by New Life is nearly identical to the relief rejected by the Supreme Court in *Pension Benefit*; the Court can see no reason (and New Life has certainly provided none) to depart from the Supreme Court's commandments in this case.

Over the past three decades, courts have applied the principles first announced in *Vermont Yankee* time and time again. The Court will only mention two here. The first, *Process Gas Consumers Grp. v. Fed. Energy Regulatory Comm'n*, 930 F.2d 926 (D.C. Cir. 1991), illustrates how these principles might apply to agency proceedings upon remand. In *Process Gas*, the D.C. Circuit Court of Appeals was asked to review a decision issued by the Federal Energy Regulatory Commission ("FERC") for the second time, a decision rendered on remand after the Court of Appeals concluded that FERC had erred in approving a gas surcharge to support research by the Gas Research Institute ("GRI"). *Id.* at 928. During the proceedings on remand, FERC "requested and received new submissions from GRI justifying its end-use research proposals," but "denied a request by certain participants for discovery of background documents supporting GRI's new submissions." *Id.* at 929. In its decision following remand, FERC adopted GRI's analysis. *Id.* The petitioners then raised a variety of challenges to the

procedures that FERC used on remand, "contend[ing] that FERC unfairly structured its procedures in favor of GRI" by denying their discovery requests and adopting most of GRI's conclusions.  *Id.* at 929-30.  The Court, quite simply, rejected each of the procedural challenges, on the basis that the agency "has broad discretion to decide what procedures to use in fulfilling its statutory responsibilities."  *Id.* at 930 (internal quotation marks and notations omitted).  Similarly, here, HHS was well within its discretion in deciding to supplement the record with a small number of documents consistent with its prior determination while simultaneously determining that it was not appropriate to permit New Life to submit additional materials; these are matters that Congress has entrusted to HHS.

More recently, in *Dist. No. 1, Pac. Coast Dist., Marine Eng'rs' Beneficial Assoc. v. Mar. Admin.*, 215 F.3d 37, 42-43 (D.C. Cir. 2000), the D.C. Circuit Court of Appeals rejected a claim that "fundamental fairness" may be used to create procedural rights where the APA and the relevant legislation envision none.  In that case, the petitioner claimed that the agency denied it "fundamental fairness" in violation of the APA by accepting and relying upon *ex parte* communications in granting an application to transfer registry of vessels outside the United States.  Echoing *Vermont Yankee*, the Court held that, "[i]n the absence of any statutory or self[-]imposed limitation, [courts] have no jurisdiction to review under the APA an agency's procedural decision regarding how best to make a substantive decision committed by law."  *Id.* at 43.  Furthermore, the Court rejected the petitioner's attempt to side-step these limitations on judicial review by arguing that, once the agency requested comments from interested parties, it effectively forfeited its discretion to rely upon such comments without first providing the public an opportunity to respond to them.  *Id.*  The Court reasoned that "how [the agency] deals with

those comments are procedural decisions that, like the underlying substantive decision, are matters within the agency's discretion." *Id.* These pronouncements apply with no less force here.

Simply put, HHS retained broad discretion on remand to decide whether, and if so how, to collect and consider additional materials in support of its determination. Agencies are, of course, free to adopt additional procedures as they see fit, but this Court is "without authority" to impose such procedural requirements against HHS' will in the absence of a constitutional or statutory command or extremely compelling circumstances, none of which are present here. *Natural Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000); *see also Transcon. Gas Pipe Line*, 423 U.S. at 333 (warning that, *inter alia*, dictating to the agency methods and procedures "clearly runs the risk of propelling the court into the domain which Congress has set aside exclusively for the administrative agency.") (internal quotation marks and notations omitted). Accordingly, the Court concludes that HHS did not act arbitrarily, capriciously, or otherwise not in accordance of law, nor abused its discretion, by supplementing the record with additional materials in support of its Second Denial Letter while simultaneously denying New Life's request to supplement its application.

### 3. The Timing of HHS' Second Denial Letter

The third procedural error ascribed by New Life to the proceedings on remand – *i.e.*, that HHS unreasonably delayed the issuance of its decision, Pl.'s Mem. at 5 – does not warrant a different result. New Life's argument is that, by issuing its Second Denial letter "a whopping 157 days" after this Court's remand order, *id.*, HHS ran afoul of the twenty-five day time limitation placed upon its evaluation process by the McKinney Act and its supporting

regulations.[5]  New Life's argument here fares no better than its predecessors for two reasons:

first, because HHS was not required to issue its decision within twenty-five days of remand, it

committed no error; and second, even if HHS' delay somehow constituted error, New Life has

nevertheless failed to carry its burden of establishing that the error was prejudicial.

        a.        HHS Was Not Required to Issue its Decision Within Twenty-Five
                  Days of Remand

The inquiry begins with the statutory and regulatory landscape.  The two relevant

provisions are essentially coterminous.  Section 11411(e)(3) of the McKinney Act provides, in

relevant part:

> No later than 25 days after receipt of a completed application, the
> Secretary of Health and Human Services shall review, make all
> determinations, and complete all actions on the application.

42 U.S.C. § 11411(e)(3).  Meanwhile, the regulations provide as follows: "HHS will evaluate

each completed application within 25 days of receipt and will promptly advise the applicant of its

decision."  45 C.F.R. § 12a.9(e)(2).

Unsurprisingly, the parties offer conflicting interpretations of these provisions.

Defendants maintain that the time limitations contemplated by § 11411(e)(3) and its

accompanying regulation relate only to the initial submission of an application, and have no

applicability to the agency's reconsideration of an application upon remand from the district

court.  Defs.' Mem. at 5 n.1.  Although never expressed with model clarity, New Life's

contention appears to be that the provisions should be read to require HHS to act within twenty-

---

     [5]  Although it need not belabor the point, the Court notes that New Life does not explain
why, if it actually believed that HHS was obligated to render a decision within twenty-five days
after remand, it proposed to HHS that it be afforded a total of fifty-two days to submit a revised
application.  *See* Dec. 11, 2009 Ltr. from E. Waters to D. Rybicki at AR1059-60.

five days after remand.  Pl.'s Reply at 2.

In resolving these conflicting interpretations, the threshold determination for the Court, although one not addressed by the parties, is the level of deference to be afforded Defendants' proffered interpretation.  The basic legal framework is well-established and non-controversial: unless Congress has directly spoken to the question at issue, the court's role is limited to determining whether the agency's construction of a statute it administers "is based on a permissible construction of the statute."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984); *see also Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (agency's interpretation of its own regulation must be given controlling weight unless plainly erroneous or inconsistent with the regulation).  That framework becomes somewhat more complicated where, as here, multiple agencies are charged with administering a statute and enacting enabling regulations.  *See, e.g.*, Regulations to Carry Out the Requirements of Title V of the McKinney Act, 56 Fed. Reg. 23789-01 (May 24, 1991) (identifying HHS, GSA, and HUD as promulgators of joint interim final rule).

In this Circuit, where multiple agencies are charged with administering a statute, a single agency's interpretation is generally not entitled to *Chevron* deference; instead, the court must review the agency's interpretation *de novo.  Grant Thornton, LLP v. Office of Comptroller of the Currency*, 514 F.3d 1328, 1331 (D.C. Cir. 2008); *but see 1185 Ave. of Ams. Assoc. v. Resolution Trust Corp.*, 22 F.3d 494, 497 (2d Cir. 1994) (adopting middle-ground approach affording some deference, but short of full *Chevron* deference, to the interpretation proffered by a single agency); *Bd. of Trade of Chicago v. Secs. & Exch. Comm'n*, 187 F.3d 713, 719 (7th Cir. 1999) (suggesting "it is possible to defer simultaneously to two incompatible agency positions").  The alternative, it

is said, "would lay the groundwork for a regulatory regime in which either the same statute is interpreted differently by the several agencies or the one agency that happens to reach the courthouse first is allowed to fix the meaning of the text for all." *Rapaport v. U.S. Dep't of Treasury, Office of Thrift Supervision*, 59 F.3d 212, 216-17 (D.C. Cir. 1995), *cert. denied*, 516 U.S. 1073 (1996).  Of course, there would be no comparable concern if all three agencies charged with administering the McKinney Act pressed the same interpretation before this Court, but only two of the three, HHS and GSA, are parties to the present proceeding.  *Compare Individual Reference Servs. Grp., Inc. v. Fed. Trade Comm'n*, 145 F. Supp. 2d 6, 23 (D.D.C. 2001) (regulations were the result of coordinated effort among the defendants), *aff'd*, 295 F.3d 42 (D.C. Cir. 2002).  Accordingly, even though there is no such indication, the existence of an alternative agency interpretation is at least theoretically possible.

Nevertheless, the Court is not convinced that the exception to *Chevron* deference should apply here.  This is because, whereas preceding subsections of § 11411 define the responsibilities of other agencies, *see, e.g.*, 42 U.S.C. § 11411(a), (c) (describing HUD's responsibility for canvassing landholding agencies and collecting data on surplus properties), Subsection (e) speaks to the role and responsibilities of HHS alone.  The same holds true for the relevant regulation, which mentions other agencies only insofar as defining HHS' role vis-à-vis those agencies.  *See, e.g.*, 45 C.F.R. § 12a.9(e)(4) (requiring HHS to notify GSA of the relative rankings among competing applications).  By all accounts, the statutory and regulatory text have delegated to HHS the primary responsibility for overseeing the application process attendant to Title V of the McKinney Act.  There is therefore some support for the argument that the exception to *Chevron* deference that arises where multiple agencies are charged with administering a statute should not

apply in this instance, where the text has carved out an area more clearly the domain of one agency over another. To the Court's knowledge, no court within this Circuit has yet addressed the precise issue, and, ultimately, the Court finds it unnecessary to do so here. Even applying *de novo* review to the parties' conflicting interpretations, HHS' interpretation must prevail.

New Life's argument is predicated upon a strained, and ultimately unacceptable, interpretation of the relevant statutory and regulatory language. The McKinney Act requires HHS to review an application for surplus federal property "[n]o later than 25 days after receipt *of a completed application*." 42 U.S.C. § 11411(e)(3) (emphasis added). By its plain language, the provision has no bearing upon the timing of agency decisionmaking upon receipt of an order of remand from a district court. The accompanying regulation demands the same treatment; the relevant provision only requires HHS to "evaluate each completed application within 25 days of receipt." 45 C.F.R. § 12a.9(e)(2). It too has nothing to say about the timeframe for an agency's response upon receiving an order of remand from the district court.

New Life's attempts to make an end-run around this plain language bear no fruit. New Life first suggests that any construction of the word "receipt" to mean only "initial receipt" would contravene Congress' pronouncement that "all actions relative to a Title V application should be completed in 25 days." Pl.'s Reply at 2 (citing H. Conf. Rep. No. 101-645, at 101) (internal emphasis and notations omitted). But the operative word in each provision is not so much "receipt" as it is "application," and the interplay between the two; the statute and its regulation only set a deadline for HHS to act upon receipt of an application, that and nothing else.

Perhaps recognizing that its interpretation is not supported by the text itself, New Life

next suggests that Defendants' reading would allow the agency to "render[] an unlawful decision" and "then arbitrarily enlarge the Title V processing timeframe on remand, with no apparent limits." Pl.'s Reply at 2. The suggestion that Defendants' reading would insulate the timing of agency action on remand from judicial review misses the mark for several reasons. As an initial matter, this Court is not free to re-write the unambiguous language chosen by Congress merely on the basis that policy considerations might counsel in favor of a different result; the statutory command is clear, and this Court is obligated to respect that command. In any event, despite New Life's hyperbolic averments to the contrary, interpreting the statute and the regulation by their plain meaning would not yield the world of arbitrary agency action conjured up by New Life. First, this Court highly doubts that HHS would strategically and intentionally render an unlawful decision merely to enlarge the time it has to consider an application; not only would it be nonsensical for HHS to improperly deny an application in order to buy itself more time to consider the application, the underlying decision would nevertheless remain subject to judicial review. Second, although the reviewing court must of course take into account the general reluctance to intervene in the practice and procedure of the agency decisionmaking process, there is no *per se* bar to a reviewing court specifying some timeframe for the agency's consideration upon remand, or, for that matter, encouraging the parties to reach some agreement as to the general timing for the proceedings on remand. Third, and finally, New Life's argument completely ignores that the APA provides a remedy for agency action "unreasonably delayed." 5 U.S.C. § 706(1); *see also Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004) (claims may proceed where agency "failed to take a discrete agency action that it is required to take").

In sum, even applying *de novo* review to the relevant provisions, the Court finds that

HHS was under no obligation to render its decision within 25 days of remand. By logical extension, its failure to do so was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

b.     New Life Has Failed to Establish Prejudicial Error

Furthermore, as a separate and independent ground supporting the Court's decision in this regard, New Life has once again failed to demonstrate that HHS' conduct, even if erroneous, was also prejudicial. Even crediting New Life's interpretation, and even assuming that vacatur was necessary, HHS would be free to simply reissue its decision 25 days following a second remand. Again, courts are not required to compel an agency to go through the "empty exercise of repeating a procedure according to rules where the result of the procedure is foreordained," *Wilkinson*, 27 F. Supp. 2d at 63, and the Court declines to do so here. *See also Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158-59 (2003) (expressing a reluctance to void subsequent agency action for failure to comply with statutory timing where statute itself does not specify a consequence for noncompliance).

New Life's argument that it was prejudiced by the alleged delay because the information in its application "had become stale by the date of decision, over one year later," Pl.'s Reply at 3, fails for at least two reasons. First, because the foundation of New Life's argument is that HHS erred by taking more than 25 days to act on remand, the relevant "delay," if any, extends not from the time of New Life's original application to the date of HHS' decision upon remand, but rather from the date of this Court's remand order to the date of HHS' decision upon remand. That period was a mere 132 days (*i.e.*, the full 157 days it took HHS to render its decision, subtracting the 25 days during which New Life believes HHS could have rendered a timely decision). But

New Life has adduced no evidence that would support a finding that its application became "stale" only in the course of those 132 days, as opposed to the full year that intervened between HHS' decision on remand and New Life's original application.  Second, even assuming, *arguendo*, that New Life was capable of making such a showing, in claiming that "HHS could have cured [the] harm by permitting New Life to supplement is application," Pl.'s Reply at 3, New Life again rests its argument on an untenable premise.  For the reasons described above, *see supra* Part III.A.2, New Life simply has no procedural right to supplement the record on remand, and therefore it could not be prejudiced even if HHS' delay prompted a desire on New Life's part to supplement the record.  Stated differently, the "prejudice," if any, emanates not from HHS' alleged delay, but from the failure of the APA or the McKinney Act to confer upon applicants a right to submit supplementary materials.

### 4.    Generalized Allegations of Bad Faith

The fourth and final procedural error ascribed by New Life to HHS' decision on remand, to the extent it is even independent of matters previously discussed, is that the circumstances of HHS' decisionmaking process suggest that HHS was acting not out of a desire to act as a neutral decisionmaker, but rather to insulate its decision from judicial review.  *See* Pl.'s Mem. at 4-7. This purported ground for vacatur and remand is easily disposed of and merits little attention here.

New Life, as the party challenging agency action, bears the burden of establishing that HHS acted arbitrarily or capriciously.  *Abington Crest*, 575 F.3d at 722.  In assessing whether New Life has discharged this burden, this Court must afford HHS' decision a presumption of regularity.  *Grid Radio*, 278 F.3d at 1322.  To put it generously, New Life's generalized,

conclusory, and wholly unsupported allegations of agency bad faith fall short of the

circumstances that would justify overcoming this presumption and concluding that New Life has

discharged its burden of proof. *Cf. Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp.

2d 57, 65 (D.D.C. 2002) ("conclusory allegations of bad faith and inadequate procedures," and

claims that the agency's action was a "sham" with a "predetermined outcome" were insufficient

to warrant heightened review), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 1218

(2004).

Because New Life attributes no further procedural errors to the proceedings on remand,

the Court concludes that New Life has failed to carry its burden of establishing that HHS'

procedural decisions on remand were arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law. At bottom, New Life's unhappiness with the outcome on remand,

while understandable, cannot be ascribed to the process below: New Life was afforded all the

process to which it was due under the APA, the McKinney Act, and the supporting regulations.

B.    *New Life Has Failed to Establish that HHS' Decision on Remand Was
       Substantively Defective*

New Life next contends that, even if HHS' conduct below on remand was not

procedurally defective, the Second Denial Letter is nevertheless substantively arbitrary or

capricious. Pl.'s Mem. at 7-13. New Life's objections in this regard are three-fold: (i)

New Life first asserts that the Second Denial Letter violates a permanent injunction entered

against HHS in a separate action, *see infra* Part III.B.1; (ii) New Life next argues that the Second

Denial Letter is arbitrary or capricious because it faults New Life's proposed staffing model,

which HHS approved in the context of other applications, and because it required New Life to

establish formal referral arrangements with local service providers, *see infra* Part III.B.2; and (iii)

finally, New Life suggests that HHS violated its own regulations by requiring New Life to fully implement its proposed program within a year, *see infra* Part III.B.3. For the reasons described below, none of the ascribed errors provides a basis for vacating the Second Denial Letter and remanding for further proceedings.

### 1. The Permanent Injunction in the *NLCHP* Litigation

New Life first asserts that HHS, in the course of evaluating New Life's application under the "financial ability" criterion – which requires an assessment of "[t]he adequacy of funding that will likely be available to run the program fully," 45 C.F.R. § 12a.9(e)(2)(v) – contravened a permanent injunction entered against HHS by this Court in *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, No. 88 Civ. 2503 (RCL) (D.D.C.) (the "*NLCHP* Litigation"), an injunction which more or less provided that, where applicants for the use of federal property represent that they intend to seek federal grant funds under Title IV of the McKinney Act, HHS must afford that representation a certain solicitude in determining whether the applicant has the "financial ability" to administer the proposed program. The Court does not agree that the Second Denial Letter runs afoul of the injunction,[6] and its analysis here proceeds in two parts: (i) because the parties sharply dispute its scope, the Court begins by reviewing the nature of the permanent injunction entered in the *NLCHP* Litigation; (ii) thereafter, the Court shall explain why the injunction has no applicability here.

---

[6] In the Second Denial Letter, HHS determined that New Life "fail[ed] to demonstrate the requisite financial ability," a conclusion it based on a wide range of considerations, including (i) "a financial analysis of [New Life's] past financial performance, (ii) "overly optimistic projected revenues," and (iii) "inadequate projected expenses." 2d Denial Ltr. at AR1222-25. HHS only referred to federal grant funds in connection with the second component – projected revenues – and even then only as one part of its analysis. *Id.*

35

a.   The Scope of the Permanent Injunction in the *NLCHP* Litigation is Limited

By way of background, many applicants seek federal funding through Title IV of the McKinney Act, 42 U.S.C. §§ 11360 *et seq.*, in order to obtain the necessary funds to administer a proposed homeless assistance program under Title V of the Act.  As a general matter, the federal government makes financial assistance available under Title IV through three grant programs, the precise contours of which are not germane here.  *See* 42 U.S.C. §§ 1401, 11381, 11403.  The financial assistance application process, entrusted primarily to HUD, is structured around a community-based system whereby applications for Title IV grant funds are funneled through what is known, in administrative parlance, as a "Continuum of Care" – *i.e.*, a local network of homeless assistance providers, state and local governments, and other interested parties.  *See* Not. of Funding Availability (NOFA) for the Continuum of Care Homeless Assistance Program, 73 Fed. Reg. 39840-01 (July 10, 2008).  Among other things, the *NLCHP* Litigation addressed the extent to which an applicant for the use of federal of property under Title V of the McKinney Act could rely upon the prospect of obtaining federal funding under Title IV of the Act in order to satisfy the "financial ability" criterion.[7]

---

[7]  Strictly speaking, the *NLCHP* Litigation did not directly address the "financial ability" criterion set forth in 45 C.F.R. § 12a.9(b)(4), which requires an applicant for the use of federal property under Title V of the McKinney Act to include in its application an indication "that it can assume care, custody, and maintenance of the property and that it has the necessary funds or the ability to obtain such funds to carry out the approved program of use for the property."  Rather, the immediate provisions at issue were 45 C.F.R. § 12a.8(b)(2), (4), which together require that any requests by HHS for the assignment of federal surplus property be based upon a finding that "[t]he applicant is willing, authorized, and in a position to assume immediate care, custody, and maintenance of the property" and "has the necessary funds or the ability to obtain such funds, to carry out the approved program."  Because the provisions are essentially coterminous, the distinction is immaterial in this setting.

Turning now to the contours of the *NLCHP* Litigation, in 1988, this Court issued a preliminary injunction against the federal agencies responsible for administering the McKinney Act, including HHS and GSA. *See Nat'l Coalition for the Homeless v. U.S. Veterans Admin.*, 695 F. Supp. 1226 (D.D.C. 1988) (Gasch, J.). That preliminary injunction was subsequently converted into a permanent injunction. *See Nat'l Coalition for the Homeless v. U.S. Veterans Admin.,* No. 88 Civ. 2503 (OG), 1988 WL 136958 (D.D.C. Dec. 15, 1988) (Gasch, J.). Thereafter, the plaintiffs in that action moved for an order enforcing the injunction, and, in 1991, the Court issued an enforcement order (the "Enforcement Order"). *See Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 765 F. Supp. 1 (D.D.C. 1991), *aff'd*, 964 F.2d 1210 (D.C. Cir. 1992).

Although the Enforcement Order addressed various aspects of the regulatory framework for implementing the McKinney Act, only one is relevant here – *i.e.*, the Court's treatment of HHS' refusal, in applying the "financial ability" criterion, "to accept an [applicant's] intent to seek funding under Title IV as a sufficient financial showing." *Id.* at 11. At the heart of the Court's decision was a concern that HHS' interpretation of the "financial ability" requirement had placed a certain class of applicants in an untenable situation: on one hand, an applicant could be denied federal funds under Title IV on the grounds that its application for the use of federal property under Title V had not been approved; on the other hand, HHS would not approve an application where the applicant's financial ability was based on Title IV funds alone. *Id.* To address this concern, the Court ultimately incorporated into its permanent injunction a requirement that HHS "allow an intent to apply for Title IV funds to be sufficient to satisfy the homeless provider's financial showing requirement." *Id.* at 13.

The scope of this aspect of the Court's permanent injunction has been the subject of considerable dispute among the parties. What is clear, however, is that the Court did not foreclose HHS from considering an applicant's financial ability under any circumstances. Indeed, the Court "recognize[d] that it is only prudent for [HHS] to require applicants to make some financial showing," and only rejected a regulatory approach that would absolutely require applicants to identify "an alternate source of funds" above and beyond federal funding under Title IV. *Id.* at 11; *see also id.* at 14 ("defendants cannot reject an application on the basis that an alternative source of funding has not been identified."). By its terms, the Enforcement Order imposes no specific restrictions on HHS' ability to evaluate the sufficiency of an applicant's showing of financial ability where that applicant relies solely on sources of funding other than federal grant funding under Title IV, or relies on such sources in addition to Title IV funding.

The Enforcement Order was not the last word on the matter. On appeal, the D.C. District Court of Appeals affirmed the Enforcement Order, but only after giving it a particular construction, the contours of which are dispositive of the question now before the Court. As interpreted by the Court of Appeals, the Enforcement Order "require[s] only that HHS give qualified approval to a wholly unfunded, otherwise acceptable application for surplus property." *Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Dep't of Veterans Affairs*, 964 F.2d 1210, 1212 (D.C. Cir. 1992) (emphasis omitted). At the same time, the Court of Appeals acknowledged that an applicant's "mere intent" to apply for federal funds under Title IV does *not* suffice to show that it has the requisite financial ability to take title to the property at issue. *Id.* at 1213. Critically, the Court of Appeals saw the Enforcement Order as concerning only "a particular kind" of applicant – namely, one that (i) "intends to apply" for federal funds under

Title IV, (ii) "has no other source of funding," and (iii) "in all other respects is eligible to receive the requested property." *Id.* at 1212. This construction was not mere dictum, but a necessary premise of the Court of Appeals' decision.[8]

At first glance, the narrowness of the Court of Appeals' interpretation might not appear to make much sense; if an intent to seek Title IV funding should suffice on its own, one might logically surmise that an intent to seek Title IV funding coupled with additional sources of funding should suffice as well. But the potential incongruity is easily explained. The Court of Appeals' conclusion that this aspect of the permanent injunction applied only to "a particular kind" of applicant, *id.*, is a direct outgrowth of this Court's concern that a specific class of applicants – *i.e.*, applicants who claimed no other source of funding and were otherwise qualified – was forced into a "Catch-22," a situation in which applications were being denied under Title IV for non-compliance with Title V and *vice versa*, *Nat'l Law Ctr.*, 765 F. Supp. at 11. Because this concern did not have the same resonance outside the designated class, it was eminently sensible to limit the scope of the permanent injunction to those applicants who intended to apply for federal funds under Title IV, had no other source of funding, and were otherwise eligible to receive the property sought. *Nat'l Law Ctr.*, 964 F.2d at 1212. While policy considerations arguably may counsel in favor of a broader injunction, and while the Court might reach a different conclusion if presented with the same question today, that does not change the fact that the permanent injunction is so limited, the only salient fact necessary for resolution of the issues now before the Court.

_____

[8] Indeed, New Life is hard-pressed to evade this conclusion. *See* Pl.'s Reply at 5 ("New Life agrees that the D.C. Circuit [Court of Appeals] discussed the injunction as applied to applicants that are 'wholly unfunded, but otherwise acceptable'").

Not long after the Court of Appeals' decision, the matter was revisited by this Court when the agencies responsible for administering the McKinney Act requested a modification of the permanent injunction. *See Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 819 F. Supp. 69 (D.D.C. 1993) (Gasch, J.). Although New Life appears to vest a fair amount of significance in this decision, Pl.'s Reply at 5, it is actually of little consequence. In that decision, the Court found it unnecessary, as the agencies had requested, to expressly incorporate the D.C. Circuit Court of Appeals' interpretation of the Enforcement Order into the permanent injunction itself. *Nat'l Law Ctr.*, 819 F. Supp. at 74. While the Court may have "rejected HHS'[] request," Pl.'s Reply at 5, it did not (nor, for that matter, could it) reject the Court of Appeals' interpretation itself. Instead, it essentially found that, by virtue of the Court of Appeals' affirmance of the Enforcement Order, that interpretation was *already* part and parcel of the permanent injunction. *Nat'l Law Ctr.*, 819 F. Supp. at 74. As if that were not enough to foreclose New Life's argument, the Court in any event expressly "adopt[ed]" the Court of Appeals' interpretation. *Id.* Accordingly, properly construed, the permanent injunction upon which New Life relies requires only that HHS afford qualified approval to an application for surplus property where the applicant (i) intends to apply for federal funds under Title IV, (ii) has no other source of funding, and (iii) is otherwise qualified to receive the property in all other respects.[9]

---

[9] The final chapter in the *NLCHP* Litigation was written ten years ago, when the Court issued an additional enforcement order having no immediate bearing on this case. *See Nat'l Law Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25 (D.D.C. 2000) (Lamberth, J.).

        **b.**       Because New Life Relied on Other Sources of Funding and Was
                    Not Otherwise Qualified, the Permanent Injunction Does Not
                    Apply to New Life's Application

Having now defined the scope of the permanent injunction, the Court turns to the

question of whether the injunction applies in this case, which requires relatively little in the way

of explication. For at least two separate reasons, New Life is not the "particular kind" of

applicant captured within the ambit of the permanent injunction. In reaching this conclusion, the

Court assumes, without deciding, that New Life has sufficiently stated an intention to apply for

federal funds under Title IV, and therefore meets the first essential characteristic of the covered

class.[10]

First, the record is clear: New Life does not depend exclusively on Title IV funding in

support of its application, nor has it ever suggested otherwise despite the fact that it serves as an

important component of Defendants' opposition. *See, e.g.*, Table of Projected Revenues at

AR949-54; Financial Stmts. and Suppl. Information at AR959-72; *see also* Defs.' Opp'n at 8;

Pl.'s Reply at 4-5. As such, New Life does not qualify as the "particular kind" of applicant

---

[10] In opposition to New Life's motion, Defendants rely in part upon a declaration from Robyn S. Raysor ("Raysor"), the Deputy Director of the Office of Special Needs Assistance within HUD, for the proposition that, despite signaling its intention to do so, New Life has taken no actual steps to apply for Title IV funding. Defs.' Opp'n at 8 n.3; *see also* Decl. of Robyn S. Raysor ("Raysor Decl."), Docket No. [41-1]. In that declaration, Raysor avers that New Life did not apply for Title IV funding to any Continuum of Care network in Missouri for fiscal-year 2009, and was therefore ineligible to receive Title IV funds for that year. Raysor Decl. ¶¶ 10-11. The precise import of Defendants' argument is not altogether clear, but the implication appears to be either that New Life has unduly delayed seeking Title IV funds or that its expressed intention to seek such funds is not *bona fide*. Even assuming the declaration testimony (which is not part of the administrative record) is a proper subject for this Court's consideration, Defendants cite to no authority suggesting that these facts would take New Life out of the class covered by the permanent injunction. However, because adequate and independent grounds exist for the Court's disposition, the issue need not be decided here.

covered by the permanent injunction, *Nat'l Law Ctr.*, 964 F.2d at 1212, and its argument fails on this ground alone.

Second, even setting aside the "financial ability" requirement, HHS separately determined that New Life failed to meet the threshold requirements for three other criteria – namely, services offered, need, and implementation time. *See* 2d Denial Ltr. at AR1215-1225. For the reasons stated elsewhere, *see infra* Parts III.B.2 and III.B.3, the Court concludes that New Life has failed to carry its burden of demonstrating that HHS acted arbitrarily or capriciously in determining that New Life failed to satisfy the "services offered" and "implementation time" criteria. Meanwhile, New Life has challenged HHS' determination with respect to the "need" criterion – which pertains to "[t]he demand for the program and the degree to which the available property will be fully utilized," 45 C.F.R. § 12a.9(e)(2)(ii) – only insofar as HHS' findings are contradicted by supplemental materials allegedly evidencing the exacerbation of "an already dire need for homeless assistance in greater Cape Girardeau." Pl.'s Mem. at 14. For reasons previously explained, *see supra* Part III.A.1, the existence of these materials does not render HHS' decision arbitrary or capricious. As Defendants correctly note, New Life has otherwise failed to dispute "a single fact contained in the five pages of . . . findings exhaustively analyzing and refuting the statistical claims [relating to the need for the proposed program] in [New Life's] application." Defs.' Opp'n at 16. As such, HHS' findings with respect to the "need" criterion are uncontested. Because HHS' determinations with respect to all three of these criteria – services offered, need, and implementation time – were not arbitrary or capricious, New Life was not "otherwise qualified" to receive the property in all other respects, *Nat'l Law Ctr.*, 964 F.2d at 1212, and its argument fails on this ground as well.

2. New Life's Proposed Staffing Model and Arrangements with Local Services Providers

The second substantive error ascribed by New Life to HHS' determination concerns the "services offered" criterion, pursuant to which HHS evaluates "the extent and range of proposed services." 45 C.F.R. § 12a.9(e)(2)(i). Specifically, New Life contends that HHS acted arbitrarily or capriciously in faulting New Life's proposed staffing model, which HHS had approved in the context of other applications, and in requiring New Life to establish formal referral arrangements with local service providers. Pl.'s Mem. at 9-10, 12-13. Because New Life fundamentally misconstrues the nature of HHS' findings in both instances, neither contention warrants vacatur or remand.[11]

a. New Life Has Failed to Carry its Burden of Establishing that HHS Erred in Addressing the Proposed Staffing Model

Beginning with New Life's proposed staffing model, New Life's overarching argument is that rejecting its application on the basis of its staffing model would be inconsistent with HHS' prior decisions approving of the same staffing model in connection with other programs (and, as such, would be arbitrary or capricious).[12] Pl.'s Mem. at 9-10. Defendants, for their part, persuasively counter that its decision was a contextual one: *i.e.*, that the staffing model proposed by New Life was inadequate given the specific size and scope of the program New Life proposed

---

[11]  As a separate and independent ground for upholding HHS' decision in both respects, New Life utterly failed to address Defendants' counter-arguments on reply, rendering those arguments conceded. *See* Defs.' Opp'n at 12-14.

[12]  In passing, New Life also suggests that it "borders on the absurd" for HHS to fault New Life for failing to identify specific individuals as clinical social workers. Pl.'s Mem. at 9. Simply put, the Court does not read the Second Denial Letter to impose such a requirement. 2d Denial Ltr. at AR1217.

for the Broadway Street Property.  *See* 2d Denial Ltr. at AR1216-17.  Among other things, HHS took stock of the size and diversity of the community to be served, noting that New Life anticipated "serv[ing] 125 individuals per year through transitional housing and an additional 1,100 persons through emergency shelter and a free store" and that the overall community served would span single men, single women, children, families, and veterans.  *Id.* at AR1216.  It then went on to break down in considerable detail the staffing model proposed by New Life, including the number and qualifications of staff, which would consist of four full-time and four part-time staff members in year one.  *Id.* at AR1217.  Based on this analysis, HHS concluded as follows: "given the broad range of clients proposed to be served through the program, and the complex needs likely to be present among program participants, the proposed staffing model is insufficient to provide services for the number of individuals the program intends to serve."  *Id.*  By any account, HHS examined the relevant data, brought its expertise to bear on the issue, articulated an explanation for its action, and drew a rational connection between the facts found and the choice made, the very essence of reasoned decisionmaking.  The Court is not free to second-guess this assessment here; New Life has failed to carry its burden of establishing that HHS' determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

     b.  New Life Has Failed to Carry its Burden of Establishing that HHS Erred in Addressing its Arrangements with Service Providers

    Before turning to the heart of New Life's argument concerning its proposed referral arrangements with local service providers, a preliminary matter must be addressed: here, New Life again critiques HHS' reference to the letters from Mending Hearts and Safe House, and cites to materials that are not a part of the administrative record to intimate that its ability to establish

arrangements with local service providers has recently improved.  For reasons described in

greater detail elsewhere, the first argument fails because HHS did not err by supplementing the

record on remand; the second argument fails because, absent rare circumstances, which New Life

has not even attempted to establish here, a court's review of agency action must be based on the

administrative record.  *See Envtl. Def. Fund*, 657 F.2d at 284.  This leaves the essential thrust of

New Life's argument – *i.e.*, that it is arbitrary or capricious for HHS to require applicants to

establish formal referral relationships with local service providers.  Pl.'s Mem. at 12.  This

Court's review of New Life's application and HHS' decision reveals no such error.

In its application, New Life indicated:

> New Life . . . strives to establish informal working relationships with
> other homeless service providers to secure client access to a [sic]
> extensive multitude of services other than those offered by [New
> Life].  Each program area shall have procedures to provide for
> coordination and impending communication between the internal
> programs and external agencies.
>
> Furthermore, when applicable, New Life staff members will assist
> residents in accessing local advocacy groups, consumer groups, self-
> help groups or other organizations that may aid and nurture the client
> in the recovery process.

Appl. at AR726.  Elsewhere in its application, New Life refers in passing to, *inter alia*,

"[l]inkages and referral[s] to internal and external supportive services including, but not limited

to, benefit programs, in-patient or out-patient mental health or substance abuse treatment . . . or

support groups," *id.* at AR732, "referrals with . . . women's alcohol and substance abuse

programs," *id.* at AR729, and "cooperating with all local agencies providing child-care," *id.* at

AR728.

Responding to these proposals, HHS underscored in its Second Denial Letter that,

"throughout [New Life's] application, referral relationships are described as informal and supported only by references to telephone conversations." 2d Denial Ltr. at AR1216. Additionally, HHS highlighted that New Life submitted no documents identifying "specific commitments to facilitate delivery of these services or to provide referrals." *Id.* As a consequence, HHS found that, while "it is acceptable for an applicant to propose providing services via referrals . . . [New Life's] application fails to adequately support its proposal and demonstrate that [it] would successfully implement the referral program it proposes." *Id.* at AR1217. Its conclusion in this regard was but one basis for its broader determination that New Life had failed to satisfy the "services offered" criterion, a determination that also rested on the perceived inadequacy of New Life's proposed staffing program. *Id.*

New Life's first attack on HHS' determination – *i.e.*, that "there is no requirement that a Title V applicant have a formalized relationship with other organizations in order to make referrals," Pl.'s Mem. at 12 – is a strawman. HHS has never asserted, either in the proceedings below or before this Court, that the McKinney Act requires applicants to establish formal referral relationships with local service providers. Rather, HHS' defense rests on the contours of the "services offered" criterion itself; pursuant to the governing regulations (the validity of which New Life does not challenge), HHS is required to evaluate "the extent and range of proposed services, such as meals, shelter, job training and counseling." 45 C.F.R. § 12a.9(e)(2)(i). As the application packet makes clear, the list is non-exhaustive; "other services are considered as they are proposed" by the applicant. Criteria for Appl. Review at AR690; *see also* 45 C.F.R. § 12a.9(b)(3) (an "applicant must fully describe the proposed program and demonstrate how the program will address the needs of the homeless population to be assisted."). Accordingly, once

New Life itself proposed offering such referral services, HHS appropriately evaluated the application to assess whether New Life had sufficiently articulated how the services would be delivered, regardless of whether they would be delivered directly or through an affiliated service provider.

New Life's second basis for assailing HHS' determination fares no better. In cursory fashion and without citation to the administrative record, New Life asserts that "the lack of such formal commitments in no way detracts from New Life's ability to make such referrals." Pl.'s Mem. at 12. Nevertheless, consistent with its mandate, HHS brought its expertise to bear upon New Life's proposals, and concluded that New Life's vague and unsubstantiated assurances "fail[ed] to adequately support its proposal and demonstrate that [it] would successfully implement the referral program it proposes." 2d Denial Ltr. at AR1217. This Court is not in a position to weigh New Life's unsupported assertion that all that is required for a successful referral program is "little more than an awareness of the services offered in the community, and a list of telephone numbers," Pl.'s Mem. at 12; Congress has entrusted such matters to the agencies, not this Court. Ultimately, the only conclusion supported by the record is that HHS examined the relevant data, articulated the reason underlying its decision, and drew a rational connection between the facts found and the choice made; as a result, while New Life may understandably disagree with HHS' determination, mere disagreement cannot discharge its burden of establishing that the determination was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 3. Implementation Time

The third and final substantive error attributed by New Life to HHS' determination on remand concerns the "implementation time" criterion, which obligates HHS to evaluate "[t]he amount of time necessary for the proposed program to become operational." 45 C.F.R. § 12a.9(e)(2)(iii). Separately, the regulations further provide that, when "construction or major renovation is not required or proposed, the property must be placed into use within twelve (12) months from the date of transfer." 45 C.F.R. § 12.3(c). New Life does not dispute that it would need at least two years to fully implement the proposed program and that no "major" construction or renovation is required for the Broadway Street Property; instead, New Life argues that HHS erred by interpreting § 12.3(c) as requiring applicants to implement their proposed program in twelve months if no major construction is involved. *See* Pl.'s Mem. at 11; Defs.' Opp'n at 10; Pl.'s Reply at 5-7.

The parties' disagreement turns on the meaning of the phrase "placed into use." 45 C.F.R. § 12.3(c). New Life reads the provision as merely requiring applicants to place the property into some use within the twelve-month time period, without ever explaining what quantum of use would suffice. Pl.'s Reply at 5-7. Defendants maintain that the provision requires that the entire program proposed by the applicant, and not just certain components or a portion thereof, must be placed into use within the twelve-month time period. Defs.' Opp'n at 11. In other words, Defendants maintain there is no room for "piecemeal program implementation." *Id.* For the reasons described above, *see supra* Part III.A.3.a, the Court shall resolve these competing interpretations applying a *de novo* standard of review; under that standard, HHS' interpretation must prevail.

Because it provides the answer to the question presented, the Court begins with a more

fulsome citation to the disputed provision, which inexplicably is given short shrift by the parties:

> [1] Where construction or major renovation is not required or
> proposed, the property must be *placed into use* within twelve (12)
> months from the date of transfer. [2] When construction or major
> renovation is contemplated at the time of transfer, the property must
> be *placed in use* within 36 months from the date of transfer. [3] If the
> applicable time limitation is not met, the transferee shall either
> commence payment in cash to the Department for each month
> thereafter during which *the proposed use* has not been implemented
> or take such further action as set forth in § 12.12 as is deemed
> appropriate by the Department. *** [4] If the facility has not been
> *placed into use* within eight (8) years of the date of the deed, title to
> the property will be revested in the United States, or, at the discretion
> of the Department, the restrictions and conditions may be abrogated
> in accordance with § 12.9.

45 C.F.R. § 12.3(c) (emphasis added). While the first two sentences of the provision may not

define the relevant "use," the third sentence makes explicit what is implied throughout: the "use"

referred to in § 12.3(c) is the "proposed use" – namely, the use proposed by the applicant. Read

in its proper context, the first sentence clearly requires that the property be "placed into [its

proposed] use" within the twelve-month period. *Id.* This interpretation of the first two sentences

gains support from the sentences that follow. The third sentence in the provision imposes a

monthly sanction upon an applicant that fails to implement the "proposed use" for the property, a

sanction that would be rendered largely nugatory by an interpretation that would broaden

"proposed use" to mean "some proposed use" or "less than the entirety of the proposed use."

The delinquent transferee could simply put the property to the barest of uses, refuse to implement

the program for which the property was granted, and disclaim any obligation to pay the monthly

fine. The same holds true for the fourth sentence; if "use" were interpreted to mean something

less than the entirety of the proposed use, there would be no force to the reversionary clause.

49

Again, an obstructionist transferee would always be able to conjure up some minimal use for the property. Further, although by no means dispositive, interpreting "use" as proposed by Defendants serves the salutary purpose of ensuring that § 12.3(c) and § 12a.9(e)(2)(iii), which requires HHS to assess "[t]he amount of time for the *proposed program* to become operational" (emphasis added), are interpreted consistently and work in tandem. For each of these reasons, the Court concludes that New Life has failed to carry its burden of establishing that HHS erred in assessing New Life's compliance with the "implementation time" criterion.

At the same time, New Life concedes that, pursuant to 45 C.F.R. § 12a.9(e)(2)(iii), HHS retained the discretion to consider the amount of time necessary for the proposed program to become operational *as a factor* in evaluating an application. Pl.'s Reply at 6. Despite this concession, New Life fails to articulate why HHS' reliance upon the projected two-year implementation time for New Life's proposed program constituted prejudicial error, supplying a separate and independent ground for upholding HHS' decision.

C. *New Life Is Not Otherwise Entitled to an Order Allowing it to Submit a Supplemental Application*

As a final resort, New Life appears to suggest that, even if HHS' decision was not otherwise arbitrary or capricious, the Court should, after vacating and remanding this action for further proceedings on the administrative level, order HHS to accept a supplemental application by New Life in light of the passage of time. Pl.'s Mem. at 13-15. In support, New Life maintains that changed factual circumstances – including rising unemployment, rising foreclosures, and shrinking state budgets for social services – have contributed to an even greater need for homeless assistance in the Cape Girardeau area. Pl.'s Mem. at 14. New Life also contends that, since the filing of its original application, it has established a presence in the Cape

50

Girardeau area, has already established a waiting list for its Outreach Facility after approximately three months of operations, and has received referrals from providers of homeless assistance. Pl.'s Mem. at 14-15.  For at least three reasons, any one of which is sufficient to deny the relief sought, New Life's assertions are unavailing.

First, it is black letter law that, except in rare circumstances, a court's review of agency action must be based on the administrative record.  *See Envtl. Def. Fund*, 657 F.2d at 284.  As Defendants correctly note, the materials relied upon by New Life were not part of the administrative record, and as such are not properly subjects for the Court's consideration.

Second, and more to the point, for all the reasons stated at length above, *see supra* Part III.A.2.c, the Court cannot impose upon HHS specific procedural requirements that have no basis in the APA or the McKinney Act, *Pension Benefit*, 496 U.S. at 653, and is therefore without authority to order HHS to allow New Life to supplement its application.

Third, and finally, because the Court concludes that vacatur and remand is not appropriate, New Life's request to supplement the record fails *ipso facto*.  The APA "sets forth the full extent of judicial authority to review executive agency action," *Fox Television Stations*, 129 S. Ct. at 1810, and now that this Court has concluded that HHS' decision was neither arbitrary nor capricious, the Court's inquiry is at an end.

## IV.  CONCLUSION

The Court has considered the remaining arguments tendered by the parties, and has

concluded that they are without merit.  Therefore, and for the reasons stated above, the Court

shall DENY New Life's [35] Second Motion for Vacatur and Remand and DISMISS this action

in its entirety.  An appropriate Order accompanies this Memorandum Opinion.

Date:   December 1, 2010

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
United States District Judge
